538

CONSEJO DE TITULARES DEL CONDOMINIO PARKSIDE, ETC., demandantes y recurridos, v. M.G.I.C. FINANCIAL CORPORATION, VILLA EDAMORGA INC. AND CO., ETC., demandadas y recurrente la primera; CONSEJO DE TITULARES DEL CONDOMINIO PARKSIDE, ETC., demandantes y recurridos, v. JUNTA DE APELACIONES SOBRE CONSTRUCCIONES Y LOTIFICACIONES DE PUERTO RICO, CLAUDIO UGARTE, su esposa MARGARITA DOMENECH y la SOCIEDAD LEGAL DE GANANCIALES por ellos constituida, demandados y peticionarios los últimos tres; CONSEJO DE TITULARES DEL CONDOMINIO PARKSIDE, ETC., demandantes y recurridos, v. VILLA EDAMORGA INC. AND CO. y OTROS, CLAUDIO UGARTE, su esposa MARGARITA DOMENECH y la SOCIEDAD LEGAL DE GANANCIALES por ellos constituida, demandados y recurrentes los últimos tres.

Números: RE-86-330
CE-86-431
CE-86-322

Resueltos: 13 de junio de 1991

*Jorge A. Miranda,* abogado de MGIC Financial Corporation; *Richard W. Warkus,* abogado del Consejo de Titulares del Condominio Parkside; *Ramón Rivera Iturbe,* abogado de Claudio Ugarte, Margarita Domenech y la Sociedad Legal de Gananciales; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General,* y *Carmen A. Bravo de Riefkohl, Procuradora General Auxiliar,* abogados del Estado Libre Asociado.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

El 4 de agosto de 1986, mediante resolución al efecto, este Tribunal consolidó tres recursos, dos de revisión y uno de *certiorari*, en vista de que todos estaban íntimamente relacionados en cuanto a la controversia principal.(1)

Se recurrió ante este Tribunal de una sentencia sumaria mediante la cual el tribunal de instancia determinó que ciertas áreas, sitas en la primera planta del Condominio Parkside, eran de índole comunal, no privadas.

En oposición a la sentencia dictada comparecen ante nos los codemandados M.G.I.C. Financial Corporation (M.G.I.C.), Claudio Ugarte y su esposa Margarita Domenech y la sociedad legal de gananciales por ellos constituida.(2) Levantaron varios errores. Los principales señalamientos giran en torno al hecho de que el tribunal de instancia decidió la controversia mediante sentencia sumaria. Favoreció de esa forma a la parte que se opuso, y levantó como fundamento que existía una controversia de hechos. Señalan, además, que erró el tribunal al dejar sin efecto la determinación de la Junta de Apelaciones sobre Construcciones y Lotificaciones (la Junta de Apelaciones). La Junta de Apelaciones había confirmado la determinación de la Administración de Reglamentos y Permisos (A.R.Pe.) en la que autorizó, conforme a

---

(1) El tribunal de instancia consolidó el caso Civil Núm. 85-2764 sobre revisión de la determinación de la Junta de Apelaciones sobre Construcciones y Lotificaciones de Puerto Rico (Junta de Apelaciones) con el caso Civil Núm. 84-4657 sobre acción reivindicatoria, daños y perjuicios; *injunction.*

En el caso Civil Núm. 85-2764, el Consejo de Titulares del Condominio Parkside recurrió al Tribunal Superior con el propósito de anular una determinación mediante la cual la Administración de Reglamentos y Permisos (A.R.Pe.) —y luego la Junta de Apelaciones— concedió permiso de uso comercial a las áreas en disputa.

En el caso Civil Núm. 84-4657, el mencionado consejo presentó acción reivindicadora y otros extremos contra varios codemandados con el propósito de recobrar la posesión y dominio de unos 4,000 pies cuadrados de área superficial en la primera planta del edificio.

(2) M.G.I.C. Financial Coproration (M.G.I.C.) es una corporación que, de acuerdo con las alegaciones de la demandada, formó parte de la empresa común que en unión al Sr. Edmundo De Jesús, realizaron la planificación, el desarrollo, el financiamiento, la construcción y la venta del Condominio Parkside. Además, M.G.I.C. alegadamente compró y luego vendió a Edmundo De Jesús las áreas objeto de litigio.

una solicitud del Sr. Edmundo De Jesús, un permiso de uso para operar oficinas profesionales en los locales que se encuentran en la primera planta del Condominio Parkside. Adujeron, además, que erró el tribunal al no concluir que los demandados Ugarte-Domenech son terceros registrales. Apoyan su posición en el hecho de haber adquirido de forma involuntaria, mediante subasta pública, de buena fe, y de haber inscrito su título en el Registro de la Propiedad o, en la alternativa, haber adquirido mediante prescripción adquisitiva.

I

Los hechos que dan lugar a la presentación de los recursos ante nuestra consideración tienen su génesis en la inscripción en el Registro de la Propiedad de un inmueble bajo el régimen de propiedad horizontal. Específicamente, el punto neurálgico del asunto surge porque existe una incongruencia entre la escritura matriz y los planos del edificio con relación a la descripción de ciertas áreas de la primera planta.

Conforme con la Ley de Propiedad Horizontal vigente al momento de otorgarse la escritura del edificio en cuestión, se presentó para inscripción ante el Registro de la Propiedad la escritura matriz del edificio y los planos correspondientes.(3) De acuerdo con las alegaciones del Consejo de Titulares del Condominio Parkside (Consejo de Titulares), las áreas en disputa fueron señaladas como facilidades recreativas durante el período de venta de los apartamentos. Sin embargo, en la escritura matriz éstas se identificaron como áreas de servicios vecinales (*community services areas*), mientras que en el plano correspondiente se identificaron como áreas recreativas (*recreational areas*). El Registrador de la Propiedad, por su parte, individualizó e inscribió las referidas áreas como fincas independientes.

En el 1972, con antelación al otorgamiento e inscripción en el Registro de la Propiedad de los susodichos documentos, se

_____

(3) Art. 24 de la Ley Núm. 104 de 25 de junio de 1958 (31 L.P.R.A. sec. 1292b), enmendada por la Ley Núm. 157 de 4 de junio de 1976. Las enmiendas no variaron el requisito relativo a la presentación de los planos junto con la escritura matriz.

comenzaron, por parte del dueño de la obra, una serie de gestiones y transacciones ante la Junta de Planificación del Gobierno del Estado Libre Asociado (Junta de Planificación) para que se aprobara la ubicación de servicios vecinales y usos accesorios en las áreas en controversia.

Las gestiones mencionadas fueron hechas por el Sr. Edmundo De Jesús, dueño y vendedor del Condominio Parkside, a nombre propio y/o a nombre de las corporaciones demandadas Villa Edamorga Inc. and Co. y Paradise Gardens, Inc. Así las cosas, éste consiguió que previo a la inscripción de la escritura matriz para someter el edificio bajo el régimen de propiedad horizontal, la Junta de Planificación emitiera una resolución en la cual se aprobó un uso distinto al que se autorizó originalmente. Mediante la cuarta extensión al informe Núm. 66-L-001-F, el 22 de febrero de 1972 la Junta de Planificación aprobó la ubicación de servicios vecinales en la primera planta del edificio. La aprobación se hizo conforme a la propuesta de Villa Edamorga Inc. and Co. de utilizar las áreas para oficinas de médicos.

Luego de la autorización inicial, Villa Edamorga Inc. and Co. promovió otras solicitudes que fueron denegadas por la Junta de Planificación. Una de ellas en particular, luego de los trámites administrativos de rigor, culminó en una revisión judicial en el Tribunal Superior, Sala de San Juan (*Villa Edamorga, Inc v. Junta de Apelaciones*, 75-4435). En este caso, el hoy recurrido Consejo de Titulares compareció, primero en el foro administrativo y luego en el tribunal, como parte interventora. Su posición consistió en oponerse a una solicitud de permiso de uso por parte de Villa Edamorga Inc. and Co. para utilizar las áreas en controversia para una oficina de bienes raíces y, otra para una compañía de representantes de detergentes. En su comparecencia el Consejo de Titulares, aunque expresó su oposición a los usos pretendidos por el Sr. Edmundo De Jesús, hizo constar su apoyo en favor del uso de tales oficinas para servicios médicos.(4) El

---

(4) Entre otras cosas, alegaron en su escrito que "[t]odos los incidentes en que los condómines [sic] han tenido la oportunidad de expresarse sobre este asunto, se han

tribunal de instancia en este caso confirmó la resolución de la Junta de Apelaciones, la cual denegó el permiso de uso solicitado por Villa Edamorga Inc. and Co.

En 1976, luego de la referida sentencia, construcción, venta y ocupación del edificio, el Sr. Edmundo De Jesús presentó una consulta ante A.R.Pe. para que se le indicaran los usos que, de acuerdo con la reglamentación aplicable, se le podía dar a los locales objeto de este caso. Ese mismo año, A.R.Pe. concluyó que al amparo de la Ley Núm. 76 del 24 de junio de 1975 (23 L.P.R.A. sec. 71 *et seq.*) los locales podían utilizarse para colmado, farmacia, oficinas de médicos, cafetería, ferretería, lavandería y panadería. Aclaró, sin embargo, que cada uno de estos usos debía ser objeto de solicitud por separado a ser evaluada en sus méritos previo al otorgamiento de cualquier permiso de uso.

Conforme a lo anterior, en 1981 el señor De Jesús sometió ante A.R.Pe. una solicitud de permiso de uso para operar oficinas profesionales en la primera planta. El Consejo de Titulares se opuso y levantó por primera vez el argumento sobre la titularidad de las áreas. A.R.Pe., sin embargo, autorizó el uso mediante Resolución de 28 de marzo de 1983. Frente a tal determinación, el Consejo de Titulares recurrió ante la Junta de Apelaciones de dicho organismo para oponerse a la concesión del uso comercial. Solicitaron, además, que se paralizaran los procedimientos administrativos hasta tanto se dilucidara en los tribunales la titularidad de las áreas en controversia.

mostrado completamente a favor de las oficinas médicas, y en contra no tan sólo de la presencia misma de las oficinas de bienes raíces, las cuales en forma alguna les benefician, sino también en la forma que Villa Edamorga, Inc. ha optado para proceder no sólo ante la Junta de Planificación, sino también para con los condómines [sic]". Apéndice, Anejo XXIV, *Exhibit* III, pág. 143. Agregaron más adelante que "[l]os condómines [sic] nunca protestaron al Sr. Edmundo De Jesús o a cualquier oficial de Villa Edamorga, Inc. por el propuesto uso de la primera planta del Condominio para oficinas de médicos. *De hecho, estas promesas fueron acogidas con gran entusiasmo por los compradores prospectivos.* Véase el testimonio que prestó la Srta. Providencia Vales Méndez, Presidenta de la Junta de Condómines [sic] del Condominio, en la vista pública celebrada ante la Junta de Apelaciones. De este testimonio surge claramente que la mayor parte de los condómines [sic] que se han expresado sobre el asunto respaldan tanto ahora como antes la ubicación de oficinas de médicos en la primera planta del edificio". (Énfasis suplido.) Íd., pág. 144.

A los fines de establecer su derecho, el Consejo de Titulares presentó ante el Tribunal Superior, Sala de Bayamón, una acción civil de reivindicación de propiedad.(5)

Aunque la Junta de Apelaciones detuvo inicialmente sus procedimientos, posteriormente los reanudó y confirmó el permiso de uso comercial de las áreas concedido por A.R.Pe. El Consejo de Titulares recurrió de esta decisión ante el Tribunal Superior, Sala de San Juan.(6) Luego de una serie de trámites procesales, la solicitud de revisión se trasladó a la Sala de Bayamón en vista de que allí se encontraba pendiente la acción sobre la reivindicación de dicha propiedad entre las mismas partes y, en esencia, versaba sobre la misma controversia.

Por su parte, el Sr. Edmundo De Jesús, luego de obtener la correspondiente autorización de uso comercial, otorgó a través de la corporación Paradise Gardens, Inc. unas hipotecas sobre las áreas en controversia a favor de Claudio Ugarte, Margarita Domenech y la sociedad legal de gananciales constituida por ambos. Los créditos hipotecarios se constituyeron mediante escrituras con fecha de 21 de marzo de 1980.

El Sr. Edmundo De Jesús no cumplió con su obligación crediticia, por lo que el 8 de diciembre de 1981 los esposos Ugarte-Domenech y su sociedad legal de gananciales presentaron ante el Tribunal Superior, Sala de Bayamón, una acción de ejecución de hipoteca por la vía ordinaria para recobrar la cantidad de $154,403, más intereses, costas y honorarios.

El 10 de agosto de 1982 el tribunal dictó sentencia a favor de los aquí recurrentes esposos Ugarte-Domenech. El 25 de octubre de 1982, una vez la sentencia advino final y firme, se expidió el Mandamiento de Ejecución. Convocada la subasta, los recurrentes obtuvieron la buena pro por la cantidad de $112,000 en la segunda subasta celebrada. El 15 de diciembre de 1982, el alguacil del tribunal otorgó la escritura de venta judicial a favor de los

---

(5) Caso Civil Núm. 84-4657.
(6) Caso Civil Núm. 85-2764.

esposos y su sociedad, quienes inscribieron su título en el Registro de la Propiedad.(7)

En toda la documentación del tribunal hasta la escritura de venta judicial se identificaron las áreas adquiridas por los recurrentes como áreas comerciales y fincas individuales.

Así las cosas, como antes señalamos, el 20 de febrero de 1984 el Consejo de Titulares presentó la demanda sobre acción reivindicatoria. Los recurrentes Ugarte-Domenech y su sociedad legal de gananciales contestaron y adujeron como defensa afirmativa que eran terceros registrales. Luego de una serie de trámites procesales, presentaron moción de sentencia sumaria y/o desestimación acompañada de los documentos pertinentes en su apoyo. La codemandada M.G.I.C. y el Estado Libre Asociado de Puerto Rico, representado por el Procurador General, presentaron de igual manera petición de desestimación y de sentencia sumaria.(8)

El argumento principal adoptado por los demandados en su moción fue a los efectos de que son dueños en pleno dominio, su título consta inscrito y, por ende, son terceros registrales. Agregaron que los demandantes, mediante sus propios actos, habían reconocido la naturaleza comercial de las áreas en controversia. Los demandantes, en oposición a la solicitud, adujeron que existía una controversia real sustancial sobre los hechos materiales esenciales alegados por los peticionarios en su solicitud de sentencia sumaria.

El 22 de mayo de 1986 el tribunal dictó sentencia sumaria. Determinó que las áreas en disputa pertenecían en común proindiviso al Consejo de Titulares y ordenó a A.R.Pe. abstenerse de autorizar permiso de uso comercial para los dos locales ubicados en la primera planta del Condominio Parkside. Además, ordenó

---

(7) Efectivo a la fecha en que los recurrentes presentaron los recursos ante nos, alegan que han invertido más de $300,000 en las propiedades que adquirieron de forma involuntaria en pago de su crédito hipotecario.

(8) El Estado, representado por el Procurador General, compareció para alegar que el tribunal de instancia carecía de jurisdicción, ya que el recurrido Consejo de Titulares no agotó los remedios administrativos al no solicitar reconsideración de la determinación de la Junta de Apelaciones. Alegaron, además, que al no agotarse los remedios, los permisos y las autorizaciones concedidas por A.R.Pe. advinieron finales y firmes.

548

"la anulación de todas las inscripciones registrales posteriores a la inscripción del régimen de propiedad horizontal en relación a las áreas en controversia y que [se] armonice la discrepancia entre la escritura matriz y el plano de inscripción para que dichas áreas permanezcan como áreas de recreación comunales del Condominio Parkside". Apéndice, Anejo I, pág. 15. Fundamentó la decisión sobre titularidad en lo resuelto en *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225 (1978).

No conformes, los demandados recurrieron ante este Tribunal.

## II

La Regla 36.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, ofrece un valioso instrumento procesal para que en situaciones apropiadas se dicte sentencia sin necesidad de una vista en su fondo. Su propósito es aligerar la tramitación de un caso cuando de los documentos que se acompañaron a la solicitud surge que no existe disputa de algún hecho esencial material, sino que lo que resta es aplicar el derecho. *Nassar Rizek v. Hernández*, 123 D.P.R. 360 (1989); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986). Dicho de otro modo, "[s]i los hechos no están en controversia y el pleito sólo presenta una cuestión de derecho, está en orden disponer del asunto mediante sentencia sumaria". *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83, 86 (1987). Véase, también, *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989). El celebrar una vista en su fondo no se justificaría. No obstante, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido procedimiento de ley. Es por esta razón que el tribunal debe cerciorarse de la total inexistencia de controversias de hecho y que el residuo sea la aplicación del derecho". (Énfasis suprimido.) *Roig Com. Bank v. Rosario Cirino*, 126 D.P.R. 617–618 (1990).

██ "Como regla general, para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar contra-declaraciones juradas y contradocumentos que pongan en contro-versia los hechos presentados por el promovente. Si se cruza de brazos corre el riesgo de que le dicten sentencia en su contra sin la celebración de un juicio en su fondo. *Sin embargo, el solo hecho de no haberse opuesto con evidencia que controvierta la presen-tada por el promovente no implica que necesariamente proceda la sentencia sumaria o que el promovente tenga derecho a que se dicte a su favor.*" (Énfasis suplido.) *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 721. Quiere esto decir que los tribunales de primera instancia en cada proceso concederán "el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal remedio en sus alegaciones . . .". Regla 43.6 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Ante estos principios, hemos dicho que:

> No cabe duda que un tribunal puede dictar sentencia sumaria en favor de la parte no promovente si de los autos y los documentos presentados en apoyo y oposición de dicha moción surge que no existe controversia en cuanto a los hechos esenciales y que, como cuestión de derecho, procede que se dicte la misma en favor de dicha parte. . . . La sentencia sumaria es un remedio extraordinario que sólo debe concederse cuando el derecho del oponente surge con claridad y cuando el promovente ha tenido una oportunidad ade-cuada de demostrar que el oponente no tiene derecho a que se dicte sentencia en su favor como cuestión de derecho. *M.J.C.A., menor v. J.L.E.M., menor*, 124 D.P.R. 910, 930 (1989).

██ Conforme a lo anterior, el tribunal de instancia no estaba indefectiblemente obligado a decidir en favor de la parte promovente. El hecho de que una parte presente una moción de sentencia sumaria no es garantía de que, una vez se determine que ésta procede, necesariamente haya que resolverla en favor de quien la presentó.

### III

Establecido lo anterior, con el propósito de determinar enton-ces la corrección de la sentencia recurrida, procedemos, pues, a

examinar cuidadosamente los documentos que obran en los expedientes del caso ante nuestra consideración donde encontramos otros datos pertinentes y que a continuación transcribimos. De éstos surge que en 1965 la Junta de Planificación aprobó el Caso 65–2908 Lot. sobre edificio multifamiliar de 74 unidades. Posteriormente, el 22 de febrero de 1972, aprobó también mediante el informe 66-L-001-F la ubicación de servicios vecinales en la primera planta del edificio. El 11 de abril de 1972 se solicitó a la Junta de Planificación el permiso de uso del edificio. Dicho permiso fue expedido en algún momento después de esa fecha durante 1972.[9] La descripción del edificio y sus facilidades que consta en el referido documento no menciona el cambio de uso que mediante el informe 66-L-001-F se concedió con relación a las áreas de la primera planta.

El 13 de junio de 1972 se otorgó escritura matriz mediante la cual se sometió el inmueble al régimen de propiedad horizontal. El 21 de septiembre de 1972 se presentó en el Registro de la Propiedad y el 20 de diciembre de 1972 fue inscrito. El 12 de enero de 1973 el Sr. Edmundo De Jesús presentó ante el Negociado de Permisos una solicitud de permiso de construcción "consistente en divisiones en muro de bloques, pisos de asbestos vinyl y plafón acústico",[10] con relación al área para la cual, el 22 de febrero de 1972, había obtenido permiso para la ubicación de los servicios vecinales. El 6 de junio de 1973, mediante el informe Núm. 73-D-002-F, la Junta de Planificación denegó los usos propuestos en la solicitud de permiso para construcción. Mediante enmienda del referido informe, el 10 de octubre de 1973, la Junta de Planificación reconsideró su decisión anterior y concedió permiso conforme a los usos propuestos "sujeto a que las áreas al este y al oeste . . . de la caja de ascensores y escaleras deber[ían] ser incluidas como áreas comunales incluyendo los servicios sanitarios en una de ellas".[11] El 27 de noviembre de 1973, mediante escritura número treinta y uno ante el notario Juan A. Arzuaga

---

[9] La fecha exacta resulta ilegible.

[10] Recurso RE-86-330, pág. 28.

[11] Informe 73-5-1687. Apéndice, Anejo XXI, pág. 99.

Álvarez, se otorgó un acta aclaratoria con relación a las áreas en controversia en la cual Edmundo De Jesús, en representación de Villa Edamorga Inc. and Co. señaló, entre otras cosas:

TERCERO: Que para propósitos de poder efectuar la venta de los espacios mencionados en el párrafo SEGUNDO de esta acta, la compareciente ha solicitado y obtenido de la Junta de Planificación, mediante la solicitud número setenta y tres guión cinco guión uno seis ocho siete (73-5-1687), informe número setenta y tres D cero dos guión F (73-D-002-F) [sic], la requerida autorización para cambiar el uso de los espacios mencionados en el párrafo SE-GUNDO de esta escritura a oficinas comerciales, a tenor con el Reglamento de Planificación número nueve (9) sobre facilidades vecinales, Artículo quince (15), Sección segunda (2).

CUARTO: Que los demás condómines [sic] del Condominio Parkside han dado su consentimiento escrito para esta transacción mediante el otorgamiento de las escrituras individuales de compra-venta de los apartamientos de dicho condominio, en cuyo párrafo DECIMO se indica que los dueños de los apartamientos autorizan a la vendedora, la aquí compareciente, a otorgar cualesquiera actas aclaratorias y/o hacer cualesquiera cambios en el edificio para propósitos de vender las áreas disponibles del mismo, siempre y cuando dichos cambios no afecten la parte estructural exterior del edificio ni los apartamientos ya vendidos. Apéndice, Anejo XXXI, págs. 203–204.

Conforme a las anteriores aseveraciones se agregó en el párrafo séptimo:

SEPTIMO: La compareciente solicita del Hon. Registrador de la Propiedad que haga la correspondiente anotación en la descripción del edificio sometido al Registro de la Propiedad Horizontal, según antes mencionado, designando las áreas mencionadas en el párrafo SEGUNDO de esta escritura (descritas en el párrafo ONCE de la escritura matriz del Condominio Parkside) como áreas de oficinas comerciales y no de servicios vecinales, según allí aparece. Apén-dice, Anejo XXXI, pág. 204.

Por su parte, los créditos hipotecarios a favor de los esposos Ugarte-Domenech y su sociedad legal de gananciales fueron constituidos mediante las escrituras 6 y 7, de 21 de marzo de 1980,

ante el notario Adrián Andaluz García. Esto es, casi siete años después del otorgamiento de la mencionada Acta Aclaratoria.(12)

Según vimos en la secuencia de hechos y fechas correspondientes, es indudable que el constructor del inmueble contempló efectivamente llevar a cabo los trámites necesarios que permitieran un uso distinto al que se proyectó en su origen en el plano del edificio. Con estos datos en mente pasemos ahora a analizar si, conforme a derecho, estas gestiones configuraron el cambio deseado.

■ Según reconocido, "el régimen de propiedad horizontal está rigurosamente supeditado al requisito de inscripción registral. En otras palabras, para que exista dicho régimen en relación con una propiedad en particular, el mismo tiene que constar inscrito en la sección correspondiente del Registro de la Propiedad". *García Larrinua v. Lichtig*, 118 D.P.R. 120, 128 (1986). Este trámite es de carácter constitutivo.

■ Como requisito particular en cuanto a la inscripción se refiere, la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291 *et seq.*, en lo pertinente dispone que:

La copia certificada de la escritura que origine la primera inscripción del inmueble total y la copia certificada de la que origine la primera inscripción del apartamiento individualizado, para su inscripción en el registro de la propiedad, *deberán tener agregadas copias completas y fieles de los planos de dicho inmueble o de los planos del apartamiento de que se trate, según los casos, para que queden archivados en el registro de la propiedad. Dichos planos serán certificados, sin pago de derechos, por el Administrador de Reglamentos y Permisos e indicarán de modo gráfico los particulares del inmueble o del apartamiento, según los casos."* (Énfasis suplido.) 31 L.P.R.A. sec. 1292b.

_____

(12) Según se desprende del edicto de subasta, el área comercial número uno (1) está inscrita al folio 101 del Tomo 668 de Guaynabo, Anotación B, Finca Núm. 26,677. El área comercial número dos (2) está inscrita al folio 106 del Tomo 668 de Guaynabo, finca Núm. 26,677.

■ Al interpretar el alcance de esta norma, en *Arce v. Caribbean Home Const. Corp.*, supra, págs. 257–258, sostuvimos que:

A base de los términos y preceptos de la ley, es razonable que resolvamos que estos planos permiten que un comprador o titular conozcan [sic] la totalidad del edificio y su apartamento para fines de hacer valer sus derechos. Por lo tanto, la escritura matriz no puede ser la única fuente de obligaciones y derechos entre las partes. Los planos adheridos consagran gráficamente los derechos de los interesados extendiéndose, como corolario, el ámbito de la fe pública registral a las características materiales del inmueble según éstas han sido representadas en dichos planos.

■ Es decir, por este medio el Registro de la Propiedad adquiere características de sistema catastral, y por ende, es de esperar que la realidad extrarregistral corresponda con la que surge del Registro. De surgir circunstancias que válidamente propicien variaciones en las constancias iniciales que aparecen en el Registro de la Propiedad, éstas han de prevalecer en la medida que gocen de publicidad registral. *García Larrinua v. Lichtig*, supra. En *Arce v. Carribean Home Const. Corp.*, supra, pág. 258, en lo que al constructor se refiere, en una situación como la que se discute en el presente caso, dijimos que:

Estos últimos estaban impedidos de variar el uso proyectado sin haberlo aclarado a los compradores al firmarse las escrituras de compraventa, o sin el consentimiento ulterior unánime de los condóminos. Debieron haber apercibido a los adquirentes, si ese era su deseo, que el área de juego contemplada en los planos, permiso de uso y folleto de promoción de ventas no estaba comprendida.

■ De lo anterior podemos colegir que el uso de las áreas afectadas de la primera planta pudo haberse variado válidamente si se hubiese obtenido el consentimiento de los compradores mediante las escrituras de compraventa o si, posteriormente, de forma unánime los condóminos hubieran consentido al cambio. Véase *Costa Linda, Inc. v. Registrador*, 109 D.P.R. 861 (1980).

En el caso de autos, al examinar los hechos conforme a las normas de derecho aplicables, concluimos que no se configuró la

variación del uso proyectado en los inicios para las áreas de la primera planta. Para que el informe 66-L-001-F de 22 de febrero de 1972 tuviese el efecto de cambiar el uso de las áreas, se debió haber conformado el plano de la obra con los cambios deseados. Esto, sin embargo, no se hizo. De otra parte, tenemos que la Cuarta Cláusula del Acta Aclaratoria antes transcrita —mediante la cual se pretende establecer que hubo el consentimiento uná-nime de los condóminos para el cambio deseado— a su vez alude al párrafo décimo de las escrituras de compraventa como fuente alterna del alegado consentimiento. No obstante, al analizar el lenguaje del párrafo décimo encontramos que no puede concedérsele el efecto que el otorgante del acta pretende.[13] No se trata de una expresión lo suficientemente clara y precisa como para plasmar un consentimiento informado e inequívoco a tales propósitos.

Por otro lado, si bien es cierto que de las expresiones contenidas en el escrito de intervención del Consejo de Titulares, en el caso que anteriormente se ventiló ante los tribunales,[14] se desprende la anuencia de un sector de los titulares en favor del uso del área en el primer piso para oficinas de médicos, esto no constituye el consentimiento unánime que requiere la Ley de la Propiedad Horizontal.

▬▬ Todo esto nos conduce a concluir que, en principio, las áreas en controversia podían válidamente considerarse como recreativas y, por ende, de carácter comunal. Las circunstancias que permearon el negocio jurídico, así como las constancias de que

---

[13] Aun cuando pudiéramos pensar que el informe 66-L-001-F de 22 de febrero de 1972, sometido como documento complementario, hubiese podido tener algún impacto registral, del lenguaje del Acta Aclaratoria otorgada el 27 de noviembre de 1973 se desprende que los informes a los cuales allí se alude como fuente de aprobación del cambio de uso de las áreas en cuestión, son posteriores a la fecha en que se otorgó la escritura matriz mediante la que se sometió el inmueble al régimen de propiedad horizontal (13 de junio de 1972).

[14] Caso Civil Núm. 75-4435.

del plano obraba en el Registro de la Propiedad, avalan esta conclusión.(15)

Como norma general, sería correcto en derecho concluir, como bien hizo el tribunal de instancia, que la titularidad de las áreas corresponde a la Asociación de Condóminos. Ahora bien, en vista de que hubo un adquirente posterior de un derecho real inmobiliario inscrito, que a su vez inscribió su adquisición en el Registro de la Propiedad, nos resta entonces determinar si a la luz del derecho aplicable el tribunal de instancia podía resolver mediante sentencia sumaria si los recurrentes eran o no terceros registrales.

## IV

■■■■■ A través del Art. 105 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2355, se le concede a un tercero adquirente de una propiedad inmueble, que reúna los requisitos necesarios, una protección que de otra forma no tendría. Así, el Art. 105, *supra*, en lo pertinente, señala:

> A pesar que la inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes, ni altera las relaciones jurídicas de quienes intervengan como partes en dichos actos o contratos, el tercero que de buena fe y a título oneroso adquiera válidamente algún derecho de persona que en el Registro aparezca con facultad para transmitirlo será mantenido en su adquisición, una vez haya inscrito su derecho, cuando por cualquier razón resulte inexacto el Registro, bien sea que se rescinda, resuelva o anule el título del otorgante en virtud de causas que no resulten clara y expresamente

---

(15) Con respecto al argumento de los recurrentes de que la sentencia dictada por el tribunal de instancia no tomó en consideración las determinaciones de hecho de A.R.Pe., esto en nada afecta la validez de la sentencia sobre esos extremos. Desde nuestra opinión en *Del Rey v. J.A.C.L.*, 107 D.P.R. 348 (1978), sentamos la norma de que un permiso emitido por una agencia administrativa que de alguna forma o por cualquier razón constituya un error no crea un estado de derecho que obligue a ésta o impida su corrección. En particular, sobre un hecho análogo en *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225, 258 (1978), expresamos que, "[a]un cuando la Junta de Planificación 'legalizara' a *posteriori* la edificación realizada, tal determinación podría solamente interpretarse como una autorización comprendiendo los aspectos materiales y físicos de la obra, bajo la premisa incorrecta de que sus promoventes tenían derecho a realizarla, y no como una derogación de los derechos y restricciones pactados por las partes".

del propio Registro, o que existan sobre la finca acciones o títulos de dominio o de otros derechos reales que no estén debidamente inscritos.

. . . . . . . .

La buena fe del tercero se presume siempre mientras no se prueba que al adquirir conocía la falta de exactitud del Registro.

■ Tenemos, pues, que el derecho que en este caso reclaman los recurrentes ha de evaluarse en primer término a la luz de si se les puede considerar como "un tercero civil que de buena fe y a título oneroso, en un negocio intervivos válido, adquiera un derecho real inmobiliario inscrito de persona que en el Registro de la Propiedad aparezca con facultades para transmitirle, en función de un registro inexacto, sin que consten clara y expresamente las causas de la inexactitud ni concurra alguna de las excepciones a la aplicación de la fe pública registral y que, a su vez, haya inscrito su adquisición". (Énfasis suprimido.) *Banco de Santander v. Rosario Cirino*, 126 D.P.R. 591, 603–604 (1990). Véase, además, J.M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario*, Madrid, Ed. Cometa, 1981, T. I, pág. 311.

Confrontados los criterios señalados con los actos de los recurrentes, según éstos surgen de los documentos que obran en autos, no cabe duda de que éstos cualifican como terceros civiles de un derecho real inmobiliario inscrito a favor de persona que en el Registro de la Propiedad aparece con facultades para transmitirlo. Esto es, el negocio jurídico original mediante el cual se individualizaron e inscribieron las áreas en la primera planta del edificio ocurrió mucho tiempo antes de que los recurrentes advinieran a ser parte en la controversia sobre la titularidad de las áreas. En otras palabras, ellos no fueron parte en el negocio original. Por otro lado, el Acta Aclaratoria mediante la cual se solicitó el cambio en la descripción de las áreas con el propósito de que Villa Edamorga Inc. and Co., pudiera enajenarlas, fue aceptada por el Registrador de la Propiedad. Ambas áreas se inscribieron como fincas independientes y su titularidad la ostentaba Villa Edamorga Inc. and Co.; así surgía de las constancias del

Registro de la Propiedad al momento que se otorgó la escritura de subasta judicial.

 Aquí, contrario a la situación de hechos de *Arce v. Caribbean Home Const. Corp.*, supra, y *García Larrinua v. Lichtig*, supra, posteriores a la inscripción de la escritura matriz y el plano aprobado por la Junta de Planificación existían otros asientos registrales los cuales fueron objeto de calificación registral y subsiguiente inscripción. Constan por ello inscritas, según antes señalamos, las áreas en controversia como fincas independientes y la subsiguiente hipoteca mediante la cual se gravaron ambas áreas en favor de los esposos Ugarte-Domenech.[16] Hemos expresado que "'[l]os asientos del Registro [de la Propiedad] deben ser lo más completos y claros que sea posible[, pues ello] evita confusión y la comisión de errores'". *Rosado Collazo v. Registrador*, 118 D.P.R. 577, 582 (1987). Sin embargo, una vez son objeto de inscripción y por consiguiente merecedores de la fe pública registral, tales asientos así como los actos inscritos deben "estimar[se] válidos hasta tanto los tribunales declaren su nulidad". *Cabassa v. Registrador*, 116 D.P.R. 861, 864 (1986). Surge con ello una presunción de legitimidad y validez. *González Silva v. United Fed. Savings*, 107 D.P.R. 119 (1978). Aceptamos, no obstante, que:

> La inscripción que se verifica en el Registro de la Propiedad no tiene virtudes taumatúrgicas de convertir en válido, lo que en la realidad es nulo. De ahí que la inscripción pueda decirse, en principio, que no tiene efectos *convalidantes*, pues inscrito un acto nulo o anulable, la inscripción no lo convalida, no lo purifica, siguiendo tan nulo o anulable como anteriormente a la misma. (Énfasis en el original.) Chico y Ortiz, *op. cit.*, pág. 323.

A esos efectos:

> Lo que sucede es que la discordancia entre la realidad jurídica extrarregistral y la registral no tienen un contagio respecto al

---

[16] Las hipotecas, para que sean válidamente constituidas, han de hacerse por escritura pública y esta última estar inscrita en el Registro de la Propiedad. *Martínez v. Colón Franco, Concepción*, 125 D.P.R. 15 (1989). Véase, además, el Art. 1756 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5001.

problema de la nulidad, ya que si bien la inscripción no convalida el acto o contrato que sea nulo, sin embargo, produce todos sus efectos mientras esta inexactitud registral no sea declarada. Íd., pág. 325.

■ Ante estos principios resulta indubitable que los esposos Ugarte-Domenech obraron conforme a las constancias del Registro de la Propiedad. Si bien nuestro derecho requiere cierto grado de diligencia, no podemos exigirle a quien confía en la fe pública registral que posea un grado de conocimiento técnico-jurídico que le permita pasar juicio sobre la corrección de la calificación que de los documentos presentados para inscripción haya hecho el Registrador de la Propiedad.[17] En cuanto a los otros criterios, no existe controversia de que fue un negocio intervivos, a título oneroso y cuya validez no ha sido cuestionada. Además, la inscripción posterior que de las fincas hiciera el Registrador, provocó que en el Registro de la Propiedad no constara clara y expresamente las causas de la inexactitud registral.[18]

---

[17] Desde hace varias décadas, en *Lizardi v. Caballero*, 65 D.P.R. 83, 92 (1945), en lo pertinente, postulamos que "'no se trata de requerir el estudio de un abogado experto en Ley Hipotecaria, sino de que cualquiera persona de mediana instrucción pueda ver si resulta, o no, del registro, la causa de nulidad'".

En *González Silva v. United Fed. Savings*, 107 D.P.R. 119, 129 (1978), señalamos que: "La publicidad registral genera fe pública que garantiza el tráfico inmobiliario al impartirle confiabilidad a los asientos del Registro. Estos se presumen válidos y legítimos hasta que un tribunal declare su nulidad. *Hernández v. Registrador*, 67 D.P.R. 452, 463 (1947). En virtud de este principio de legitimación se valida el propósito fundamental de nuestro sistema registral de proteger a terceros adquirentes."

Según Núñez Lagos, el título no es válido porque se inscribe, sino que se inscribe porque es válido, a lo cual Chico y Ortiz agrega que determinados títulos no válidos e inscritos improcedentemente pueden ser válidos si en el juego valorativo aparece la figura del tercero. Véase J.M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario*, Madrid, Ed. Cometa, 1981, T. I.

[18] En su sentencia, el tribunal de instancia concluyó que las áreas en cuestión no podían ser objeto de propiedad privada acorde con el inciso (g) del Art. 11 de la Ley de la Propiedad Horizontal de 1958 (31 L.P.R.A. sec. 1291i(g)). Antes de la aprobación de la Ley Núm. 157 de 4 de junio de 1976, las áreas recreativas no se designaban expresamente como elementos comunes generales y, por consiguiente, no susceptibles de estipulación en contra de su propiedad en común. Véase *Costa Linda, Inc. v. Registrador*, 109 D.P.R. 861 (1980). Por lo tanto, el criterio utilizado por el tribunal de instancia para fundamentar su decisión fue a la luz del inciso (g) de la ley vigente en ese momento. Dicho Art. 11 en ese momento disponía como sigue:

"Se consideran elementos comunes generales del inmueble:

"(a) El terreno en que se asiente el edificio.

"(b) Los cimientos, paredes maestras, techos, galerías, vestíbulos, escaleras y vías de entrada y salida o de comunicación.

La discusión que antecede, sin embargo, aún no está completa. Falta por discutir el elemento de la buena fe. Esto último, de acuerdo con la doctrina vigente, aunque pudiéramos inferirlo a favor o en contra de las partes, de acuerdo con los demás elementos examinados, no podemos decidirlo en esta etapa.

Precisamente sobre ese particular en *Banco de Santander v. Rosario Cirino*, supra, pág. 607, recientemente expresamos:

El propio Art. 105 de la Ley Hipotecaria, *supra*, dispone que se presume la buena fe del tercer adquirente. Como presunción legal *iuris tantum*, el impugnador tiene la carga de probar la mala fe del adquirente.

". . . La presunción legal de buena fe, por su carácter *iuris tantum*, es enervable, y para esto y asimismo conseguir se declare que el tercer adquirente *procedió de mala fe*, ha de resultar *probado* que este tercero *conoció indudablemente* al adquirir, que el Registro era inexacto, en el sentido amplio antes indicado.

El planteamiento de este caso entraña resolver una *cuestión de hecho* cuya apreciación y decisión corresponde a los *Tribunales de instancia*, y sólo excepcionalmente puede alcanzar las alturas de la *casación*." (Énfasis en el original.) Véase, además, *Roig Com. Bank v. Rosario Cirino*, supra.

■ En vista de que el tribunal de instancia resolvió la controversia mediante sentencia sumaria, esto privó a la parte

---

"(c) Los sótanos, azoteas, patios y jardines, salvo disposición o estipulación en contrario.

"(d) Los locales destinados a alojamiento de porteros o encargados del edificio, salvo disposición o estipulación en contrario.

"(e) Los locales o instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua, y demás similares.

"(f) Los ascensores, incineradores de residuos y, en general, todos los artefactos o instalaciones existentes para beneficio común.

"(g) Todo lo demás que fuere racionalmente de uso común del edificio o necesario para su existencia, conservación y seguridad." 31 L.P.R.A. sec. 1291i (ed. 1985).

Quiere esto decir que la determinación del tribunal se hizo conforme a si se podían considerar las áreas como *racionalmente de uso común del edificio o necesario para su existencia, conservación y seguridad*. Discrepamos del análisis y conclusión del tribunal. Las áreas en cuestión no son de tal naturaleza que racionalmente tengan que considerarse como comunes o necesarias para la existencia, conservación y seguridad del edificio. No se trata de un área de juegos, piscina, áreas verdes, canchas, etc. Por el contrario, esas áreas en la primera planta con frecuencia son utilizadas en otros edificios para ubicar distintas clases de establecimientos privados que a su vez cumplen el propósito de servir a los condóminos.

afectada de su derecho a presentar prueba para sostener su alegación de buena fe. Existe un elemento de conocimiento que el tribunal tiene que dirimir antes de concluir si hubo o no buena fe por parte de los esposos Ugarte-Domenech. Conforme a lo anterior, erró el tribunal de instancia al resolver este extremo mediante el uso de la Regla 36.1 de Procedimiento Civil, *supra.*

Por todo lo antes expuesto, *se dictará sentencia revocando la sentencia recurrida y devolviendo el caso para que, consistente con lo expresado en esta opinión, las partes puedan presentar la prueba que consideren pertinente a sus respectivas posiciones sobre el concepto de buena fe aplicable al tercero registral.*

Los Jueces Asociados Señores Rebollo López y Hernández Denton emitieron opiniones disidentes. El Juez Asociado Señor Negrón García no intervino.

—O—

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton.

Por entender que el adquirente de un inmueble sometido al Régimen de Propiedad Horizontal viene obligado a examinar la escritura matriz, coincidimos con el Juez Asociado Señor Rebollo López en que los acreedores hipotecarios del caso de autos no cualifican como terceros registrales y, por lo tanto, disentimos. Por otro lado, suscribimos esta opinión disidente por considerar que el caso de autos nos permite hacer unos pronunciamientos adicionales sobre consideraciones de política pública en este tipo de controversia. En aras de proteger la integridad material y jurídica del Régimen de Propiedad Horizontal, y por considerar que éste es acreedor a mayor protección jurídica que la figura de un tercero registral, no permitiríamos que en el caso de autos la tercería afecte el mejor derecho que, según el Código Civil, tienen los titulares de un inmueble sometido al Régimen de Propiedad Horizontal.

# I

Según la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2001 *et seq.*, la figura del tercero registral prevalece sobre aquellas personas quienes según el Código Civil tienen un derecho real. Aunque la inscripción registral *no convalida actos nulos*, se considera válido el derecho de un tercero civil que lo adquiera de buena fe y a título oneroso, de quien en el Registro de la Propiedad aparece como dueño en virtud de una inscripción inexacta, siempre y cuando esta inexactitud no surja clara y expresamente de dicho Registro. Art. 105 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2355.

De ordinario, una persona que va a gravar o a adquirir un derecho real no tiene que examinar, por no considerarse Registro de la Propiedad, los asientos que publiquen un derecho igual al suyo, con excepción del asiento que publica el derecho de su transmitente. Véase el Art. 105 de la Ley Hipotecaria y del Registro de la Propiedad, *supra.*[1] Sin embargo, por ser el Régimen de Propiedad Horizontal de naturaleza *sui generis*, presenta una variante a la regla general de folio único. Como bien expresa Camy Sánchez-Cañete:

> En los pisos o locales en propiedad horizontal . . . existen legalmente dos elementos indisolubles como formantes de aquéllos, de una parte la porción individualizada del edificio encuadrada entre linderos determinados y con salida a un elemento común o a la vía pública y de otra [parte] una cuota proindivisa en los elementos comunes del mismo. Por tanto, *no sólo estamos ante una excepción al principio de una finca un [sic] derecho, sino incluso a la de folio único, pues realmente, el folio registral o historial de cualquier piso, no sólo es el propio dedicado a él, sino también el folio general donde se conservan los elementos comunes y los estatutos de la comunidad, y en el cual se recogerán los actos o negocios jurídicos referentes a esos elementos, por lo que su contenido formará parte*

---

[1] Así, por ejemplo, si lo que se adquiere es dominio, el adquirente no viene obligado, de ordinario, a examinar los asientos que publiquen dominio y sean anteriores al de su causante. Así se evita la peregrinación por todo el historial de la finca, hasta el primer asiento, a que obligaba *Gaztambide v. Sucn. Ortiz*, 70 D.P.R. 412, 425–426 (1949).

*ineludible del folio del piso o local.* (Énfasis suplido.) B. Camy Sánchez-Cañete, *Comentarios a la Legislación Hipotecaria,* 3ra ed., Pamplona, Ed. Aranzadi, 1982, Vol. I, pág. 387.

De esta forma, el adquirente viene obligado a examinar también la escritura matriz por ser ésta "Registro" para efectos del Art. 105 de la Ley Hipotecaria y del Registro de la Propiedad, *supra,* y aunque así no lo hiciera se le imputará el conocimiento de las disposiciones de la misma. Véase *García Larrinua v. Lichtig,* 118 D.P.R. 120, 133 (1986).

De dicha escritura matriz debe surgir "clara y precisamente *el uso* a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso *sólo podrá ser variado mediante el consentimiento unánime* de los titulares". (Énfasis suplido.) 31 L.P.R.A. sec. 1291. Además, cuando exista duda sobre el destino o uso de cierta parte del inmueble, se presumirá que tiene naturaleza de elemento común. *Arce v. Caribbean Home Const. Corp.,* 108 D.P.R. 225, 237–238 (1978).

Por otro lado, la Ley de la Propiedad Horizontal requiere que conste en el Registro de la Propiedad copia de los planos del inmueble. 31 L.P.R.A. sec. 1292b. El propósito de unir los planos es que conste una mejor descripción del inmueble. Esto "'significará una saludable restricción a los derechos discrecionales del propietario vendedor'" y permite al comprador conocer la totalidad del edificio para hacer valer sus derechos. *Arce v. Caribbean Home Const. Corp.,* supra, pág. 257. Conforme con esto hemos resuelto que los planos "consagran gráficamente los derechos de los interesados extendiéndose, como corolario, el ámbito de la fe pública registral a las características materiales del inmueble según éstas han sido representadas en dichos planos". *Arce v. Caribbean Home Const. Corp.,* supra, págs. 257–258.

## II

En el caso de autos, los esposos Ugarte-Domenech venían en la obligación de revisar las constancias de la escritura matriz y los planos, por constituir éstos "Registro" de la propiedad. De

haberlo hecho, se hubieran dado cuenta de que la escritura matriz describía las áreas objeto de la hipoteca como "servicios vecinales" y el plano las describía como "áreas recreativas". Estos elementos comunes permanecían en indivisión forzosa con el inmueble, pues de las constancias del registro surgía que estas áreas fueron inscritas como fincas independientes sin el consentimiento unánime de todos los titulares. En consecuencia, la hipoteca que a favor del acreedor se constituyó recaía sobre áreas comunes del edificio y sólo podía ser otorgada tras el consentimiento unánime de todos los titulares. 31 L.P.R.A. sec. 1291g. Como cuestión de política pública imputaríamos conocimiento de estos preceptos legales a las partes involucradas en negocios jurídicos en torno al Régimen de Propiedad Horizontal, y en el caso específico de autos, entendemos que los esposos Ugarte-Domenech no podían ser terceros registrales.

## III

Por otro lado, "[e]xiste una clara política pública en Puerto Rico dirigida a estimular la utilización de terrenos y construcción de multipisos que se rijan por el Régimen de la Propiedad Horizontal". *Maldonado v. Consejo de Titulares*, 111 D.P.R. 427, 429 (1981). Esto tiene el propósito de fomentar una mejor planificación urbana en los pocos terrenos disponibles en un país sobrepoblado como el nuestro. De esta forma se garantiza la disponibilidad de una vivienda razonable aun a aquellas personas que por sus recursos u otros motivos desean vivir en un condominio.

Esta forma de propiedad *"necesita cauces jurídicos por los cuales desenvolverse para que no sea un nido de conflictos que amarguen la realización del ideal del hogar propio"*. (Énfasis suplido.) 10 Diario de Sesiones de la Asamblea Legislativa (Cámara), T. 3, pág. 1574 (1958), citado en parte en *Arce v. Caribbean Home Const. Corp.*, supra, págs. 241–242.

Como cuestión de política pública, entendemos que la integridad de este Régimen de Propiedad Horizontal debe ser

*protegida por encima de la figura de un tercero registral.*(2) De esta forma se evitarían situaciones como la presente, donde por actos ultra-vires del desarrollador de un proyecto de vivienda, éste logra segregar e inscribir, y posteriormente hipotecar, bienes comunes de un inmueble sometido al Régimen de Propiedad Horizontal en detrimento de la integridad del inmueble, sus residentes y de la propia subsistencia del Régimen de Propiedad Horizontal.

Por los fundamentos anteriormente expuestos, confirmaríamos la sentencia del foro de instancia.

—O—

Voto disidente emitido por el Juez Asociado Señor Rebollo López.

Disentimos. Entendemos que la conclusión a la que se llega en la opinión mayoritaria emitida a los efectos de que "no cabe duda de que [los codemandados Ugarte-Domenech] *cualifican como terceros civiles* de un derecho real inmobiliario inscrito a favor de persona que en el Registro de la Propiedad aparece con facultades para transmitirlo" *es una errónea en derecho.* (Énfasis suplido.) Opinión mayoritaria, pág. 556. Ello por razón de que de los documentos que constan en el Registro de la Propiedad claramente surgía —*específicamente de la escritura matriz y de los planos*— que el área en controversia era una "de servicios vecinales" y/o un "área recreativa".

Dichos datos sostienen la teoría de que dicha área corresponde a los condóminos pues la misma, conforme la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291 *et seq.*, forma parte de los "elementos comunes generales" del inmueble; *hecho que surgiendo de las constancias del Registro* —el cual, conforme la

---

(2) También, como cuestión de política pública, se han reconocido como excepciones a la tercería registral los casos de retractos legales, Art. 108 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2358; los terceros adquirentes de derechos de herederos voluntarios o legatarios que no sean herederos forzosos, durante dos años desde la inscripción del título hereditario de su transmitente, Art. 111 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2361, y las servidumbres continuas o aparentes aunque no estén en el registro.

citada ley, tiene las características de un sistema catastral—*impide que los esposos Ugarte-Domenech puedan ser considerados como "terceros registrales".* Ello así por cuanto dicho hecho no sólo pone en entredicho la corrección jurídica de —y vicia— la actuación posterior del Registrador al inscribir dichas áreas como fincas independientes, sino que, por ficción de ley, era del conocimiento del matrimonio Ugarte-Domenech. Véase *García Larrinua v. Lichtig,* 118 D.P.R. 120, 133–134 (1986).