Sánchez Martínez, Juez Ponente
*1105 TEXTO COMPLETO DE LA SENTENCIA
Este recurso presenta la siguiente controversia: si varias vendedoras, condueñas del mismo inmueble, que residen en distintos estados de Estados Unidos y comparecen al otorgamiento de una escritura de compraventa mediante un mismo apoderado, pueden exigir que el pago del precio de la compraventa, a ser hecho por una entidad bancaria en beneficio y como mandataria del comprador, se haga mediante cheques individuales pagaderos a la orden de cada una de ellas o si, por el contrario, el comprador y su banco (su futuro acreedor hipotecario), pueden imponerles válidamente el pago del precio mediante un sólo cheque pagadero a la orden de ellas conjuntamente.
El señor Edgardo Rivera Cabrera presentó una demanda para el cumplimiento específico de un contrato de compraventa e indemnización por daños contra varias personas. Estas son los cuatro dueños del inmueble objeto de la compraventa: el señor César Bermúdez Rojas y las hermanas Evangeline, Victoria Regina y Marie Antoinette Rojas Gagos. Los demás demandados son: el Ledo. Harry Ezratty Samo, apoderado de ellas; el Ledo. Femando A. Moscoso Álvarez, notario y corredor de bienes raíces; y Caney Properties, Inc.
El demandante Rivera Cabrera alegó que en febrero de 2002 suscribió un contrato de opción de compraventa por $240,000 con respecto a dos inmuebles. Pagó una prima de $15,000. Aunque el contrato de opción duraría hasta el 30 de junio de 2002, contenía una cláusula de prórroga automática que se extendió hasta febrero de 2003, cuando los vendedores notificaron que ya el título estaba aclarado. Entonces, el demandante Rivera Cabrera notificó a SANA Mortgage y, luego de los trámites normales, se citó a las partes al cierre del negocio de compraventa y constitución de hipoteca a llevarse a cabo el 7 de mayo de 2003, a las 2:00 de la tarde.
El demandante Rivera Cabrera alegó, además, que estando en el lugar del cierre, el apoderado de las tres vendedoras Rojas Gagos, solicitó al banco que emitiera tres cheques, uno para cada una de ellas —en distribución del precio de compraventa— en lugar de un sólo cheque a nombre de las tres. Cuando el banco rehusó emitir los tres cheques por ser contrario a “su política institucional”, el apoderado de las tres vendedoras y el vendedor Bermúdez Rojas abandonaron el lugar sin otorgar la escritura de compraventa. Alegó, también, que el corredor de bienes raíces, Ledo. Moscoso Álvarez, manifestó, antes de abandonar el lugar, que ya ellos tenían otro comprador que pagaría en efectivo.
El demandante Rivera Cabrera adujo que “[l]a solicitud de cheques separados que hizo el vendedor [el apoderado de las vendedoras], quien es abogado, no es decisión que dependa del comprador, sino de un tercero, sobre el cual el demandante no tiene control”. Añadió que “[l]a solicitud de cheques separados está absolutamente desvinculada, de todas las prestaciones u obligaciones que tenía que cumplir el demandante, y nos referimos tanto a obligaciones principales como a obligaciones accesorias". Y solicitó que se compeliera a los vendedores al cumplimiento específico del contrato, mas los daños sufridos.
El codemandado, Ledo. Moscoso Álvarez, presentó una moción de desestimación, sin juramentar, a tenor de la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Se basó en que la demanda dejaba de exponer una reclamación que justificara la concesión de un remedio, e incluyó varios documentos, pero ninguna declaración jurada. Adujo que las codemandadas Evangeline y Victoria Rojas Gagos residían en ciudades distintas del estado de Nueva York y la codemandada Marie A. Rojas Gagos en el estado de Tenessee. Éstas otorgaron un poder a favor del codemandado, Ledo. Ezratty Samo, el cual fue protocolizado ante él (el Ledo. Moscoso Álvarez). Incluyó copia de los tres poderes.
Añadió que el 21 de febrero de 2003, luego de avisar al comprador Rivera Cabrera de que estaban listos para vender, envió al banco SANA Mortgage copia de los documentos legales necesarios para completar la *1106 compraventa. No obstante, tuvo que enviar dos comunicaciones adicionales ante la inacción del banco y del demandante Rivera Cabrera, la última -de 5 de mayo de 2003-, haciendo referencia específica a que el contrato de opción estaba vencido. Incluyó copia de esas tres comunicaciones.
Alegó, además, que al día siguiente, 6 de mayo de 2003, SANA Mortgage le envió a él los documentos requeridos por éste (Ledo. Moscoso Álvarez), entre éstos, una hoja titulada Receipts and disbursements report en la que se indicaba la distribución de los cheques a ser desembolsados por el banco al día siguiente en el cierre del negocio. Incluyó copia de la hoja. Apéndice, a la pág. 26. Ésta revela que se emitirían tres cheques de $32,517 para cada una de las codemandadas Rojas Gagos. Adujo que esto obedeció a una solicitud a tales efectos de las tres vendedoras, ya que éstas vivían en distintos lugares de Estados Unidos. Los vendedores examinaron los documentos y los aprobaron.
Continuó alegando que el 7 de mayo de 2003, a las 2:00 de la tarde, los codemandados César Bermudez Rojas, el apoderado de las tres vendedoras, Ledo. Ezratty Samo, y él (el Ledo. Moscoso Álvarez) que actuaría como notario de la compraventa, acudieron a las oficinas de SANA Mortgage —según convenido— y allí se les entregó un nuevo Receipts and disbursements report en el que se indicaba una nueva distribución de los cheques a ser desembolsados por el banco. Apéndice, a la pág. 27. En la nueva hoja se indicaba que el banco emitiría un sólo cheque por $111,882.91 a nombre de las tres vendedoras Rojas Gagos y el vendedor Bermúdez Rojas. Incluyó copia de la hoja. Apéndice, a la pág. 27.
Ante la nueva circunstancia, el codemandado, Ledo. Moscoso Álvarez, adujo que si no se hacían cheques separados para las tres vendedoras, ellas tendrían que viajar a Puerto Rico a endosar y cambiar el cheque, lo cual les era imposible. Ante la negativa del banco de hacer el pago del precio de compraventa según acordado en el documento del día anterior, y siendo las 4:00 de la tarde, se retiraron del lugar. A esa hora, el demandante Rivera Cabrera no se había presentado al banco.
El codemandado, Ledo. Moscoso Álvarez, añadió que el demandante Rivera Cabrera incumplió el contrato al no satisfacer el precio de compraventa pactado, que fue el demandante quien escogió al banco SANA Mortgage para cerrar el negocio y que si el banco hubiese entregado el precio mediante los tres cheques que había ofrecido por escrito el día antes, el negocio se habría consumado conforme a lo pactado. Ante estas circunstancias, argumenta que el único responsable de cualquier daño'causado por la situación al demandante sería el banco SANA Mortgage, el cual no es parte en este litigio.
Por último, el codemandado, Ledo. Moscoso Álvarez, planteó adicionalmente que, de todos modos, para el 7 de mayo de 2003, el contrato de opción ya estaba vencido por 75 días. Y como, según él, el demandante Rivera Cabrera no ejerció oportunamente la opción, la parte vendedora no estaba obligada a devolver la prima. 
Luego de varias órdenes para que replicara, el demandante Rivera Cabrera se opuso a la moción de desestimación. Comenzó por aclarar que la demora que antecedió al cierre del negocio de compraventa obedeció a que la parte demandada (vendedora) se atrasó en arreglar los asuntos sucesorales que tenían que ver con la propiedad y, por tal razón, se activó la cláusula de prórroga automática que contenía el contrato de opción. Por ende, el contrato de opción estaba vigente. Tanto es así que los vendedores comparecieron al cierre a otorgar el contrato de compraventa.
Sobre la cuestión del pago del precio, indicó que “[u]na vez en el [lugar del] cierre, la parte vendedora se retiró y se negó a culminar el proceso porque el banco se negó a entregar el precio dividido en tres (3) cheques y a nombres distintos cada cheque”. Apéndice, a la pág. 44. Añadió que “[e]l pago del precio de $240,000.00 en un cheque, o dos cheques o tres cheques es un asunto totalmente accesorio, secundario”; que “el pago de $240,000.00 constituye una condición esencial; el pagar los $240,000.00 en uno o varios cheques es algo accesorio, es una condición secundaria”. Id., a la pág. 45.
*1107 Adujo, por otro lado, que el banco no era parte del contrato de opción. “Por lo tanto, si el banco se negó a entregar tres cheques a nombre de persona distinta cada uno, ese no fue incumplimiento del comprador y por tanto el vendedor no tenía a su disposición la excepción de resolución tácita (Art. 1077), dado que el banco no era parte” Id., a la pág. 47. Con respecto al argumento de que las demandadas no podían cambiar el cheque si se hacía conjuntamente a nombre de ellas, concluyó expresando que “es tan absurda, ridicula y temeraria que no merece comentario”. Id.
El Tribunal de Primera Instancia, Sala de Arecibo, luego de acoger la moción de desestimación como una moción de sentencia sumaria, la denegó por considerar que hay controversia de hechos que impide conocer la verdad sobre todos los hechos esenciales. Sostuvo que la prueba presentada por el codemandado, Ledo. Moscoso Alvarez, junto a la moción de sentencia sumaria “podrá ser derrotada por la parte promovida [el demandante Rivera Cabrera] con prueba que controvierta o rebata la evidencia presentada por el promovente [el codemandado, Ledo. Moscoso Alvarez] ”. Apéndice, a la pág. 1.
Inconforme con este dictamen, el codemandado, Ledo. Moscoso Álvarez, acude ante nos. Aduce en su petición de certiorari que el Tribunal de Primera Instancia incidió: (1) al acoger su moción de desestimación como una moción de sentencia sumaria; (2) al resolver que la prueba presentada por él puede ser rebatida por el demandante Rivera Cabrera; (3) al determinar que existe una controversia real sobre hechos esenciales; y (4) al no determinar que el contrato es ley entre las partes y que cuando sus cláusulas son claras, el tribunal está impedido de ir contra ellas. Expedimos una orden de mostrar causa dirigida al demandante Rivera Cabrera, pero ha transcurrido con creces el plazo concedido y éste no ha presentado su oposición.
Mediante el primer señalamiento de error, el peticionario se queja de que el tribunal recurrido acogió su moción de desestimación como una moción de sentencia sumaria. El error no se cometió. Si bien es cierto que él presentó una moción de desestimación por uno de los fundamentos que admite la Regla 10.2 de Procedimiento Civil, la defensa número 5 (“dejar de exponer una reclamación que justifique la concesión de un remedio”), también es cierto que la propia regla dispone que “[s]i en una moción en que se formulare la defensa número cinco (5) se expusieren materias no contenidas en la alegación impugnada y éstas no fueren excluidas por el tribunal, la moción deberá ser considerada como una solicitud de sentencia sumaria y estará sujeta a todos los trámites ulteriores provistos en la Regla 36 hasta su resolución final y todas las partes deberán tener una oportunidad razonable de presentar toda materia pertinente a dicha moción bajo dicha regla” (énfasis nuestro). Así, pues, el tribunal podía hacer lo que hizo. Torres Ponce v. Jiménez, 113 D.P.R. 58, 61 (1982). También nosotros, al adjudicar este recurso, nos referiremos a la moción de desestimación como moción de sentencia sumaria.
Los restantes señalamientos de error se refieren a cuestiones imbricadas de hecho y de derecho que ameritan su discusión conjunta.
La Regla 36.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, ofrece un valioso instrumento procesal para que en situaciones apropiadas se dicte sentencia sin necesidad de una vista en su fondo. Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538, 548-49 (1991). Su propósito es aligerar la tramitación de un caso cuando de los documentos que se incluyen con la solicitud surge que no existe controversia sobre algún hecho esencial relevante, y lo que resta es aplicar el derecho. E.g., Corp. Presiding Bishop CJC of LDS v. Purcell, 117 D.P.R. 714, 720 (1986). Sólo debe dictarse sentencia sumaria en casos claros, cuando el tribunal tenga ante sí la verdad sobre todos los hechos pertinentes. Roth v. Lugo, 87 D.P.R. 386, 397 (1963).
En el caso de autos, como hemos dicho, Rivera Cabrera alegó en su demanda que estando en el lugar del cierre, el apoderado de las tres vendedoras Rojas Gagos, solicitó al banco que emitiera tres cheques, en vez de uno, y que cuando el banco rehusó emitir los tres cheques por ser contrario a “su política institucional”, el apoderado abandonó el lugar sin otorgar la escritura de compraventa. No obstante, el codemandado, Ledo. *1108 Moscoso Álvarez, no presentó declaración jurada alguna para controvertir esta alegación ni establecer los hechos sobre los cuales sustentar una sentencia sumaria a su favor. La prueba que él presentó junto a su moción de sentencia sumaria como, por ejemplo, el documento del banco SANA Mortgage titulado Receipts and disbursements report, Apéndice, a la pág. 26, no es suficiente. Esta hoja demuestra simplemente que el 6 de mayo de 2003, es decir, el día anterior al del cierre, SANA Mortgage hizo constar que prepararía tres cheques de $32,517 para cada una de las codemandadas Rojas Gagos, pero nada dice sobre las siguientes cuestiones de gran relevancia a la adjudicación del caso: ¿Quién exigió que el pago se efectuara mediante tres cheques: las vendedoras, el apoderado de las vendedoras o el comprador? ¿Se trató de una condición esencial acordada con posterioridad al otorgamiento del contrato de opción o de una solicitud por conveniencia que a las vendedoras o a su apoderado se les ocurrió después? Si se acordó después del otorgamiento del contrato de opción, ¿cuándo ocurrió? ¿Se trató de un acuerdo entre el apoderado de las vendedoras y el comprador o entre el apoderado de las vendedoras y SANA Mortgage? ¿Participó el comprador de esta negociación o acuerdo con SANA Mortgage?
¿Estuvo justificado el apoderado de las vendedoras en negarse al cierre del negocio de compraventa por el fundamento de que las tres vendedoras residen en distintos lugares de Estados Unidos y que, de aceptar un solo cheque, esto las obligaría a viajar a Puerto Rico para hacerlo efectivo? Como apoderado de las vendedoras, ¿hubiera podido el codemandado, Ledo. Moscoso Álvarez, recibir un sólo cheque y luego cambiarlo por tres cheques pagaderos a la orden de cada una de las tres vendedoras?
Éstas son sólo algunas de las interrogantes que pueden ser dirimidas únicamente a base de prueba testifical. Son cuestiones enteramente subjetivas que involucran variados elementos de intención, en particular, porque se ha insinuado que la verdadera razón para no haberse consumado la compraventa es porque las vendedoras habían logrado un mejor negocio con un tercero. Esto, por supuesto, tiene que ser objeto de prueba y, como es natural, de la adecuada utilización de los mecanismos de descubrimiento de prueba. Como se sabe, es improcedente utilizar el mecanismo de sentencia sumaria cuando, para tener ante sí la verdad de todos los hechos esenciales a la controversia, es necesario dirimir la credibilidad de testigos y determinar la intención de las partes al obrar de determinada manera. Rosario v. Nationwide Mutual, 158 D.P.R. _ (2003), 2003 J.T.S. 34.
En el caso de autos, aunque no hubiera controversia en cuanto a que fue el día del cierre, cuando comparecieron a las oficinas de SANA Mortgage, que el condueño César Bermudez Rojas y el apoderado de las condueñas Rojas Gagos se enteraron, por primera vez, de que el banco se proponía hacer el pago del precio mediante un sólo cheque, el Tribunal de Primera Instancia no podía dictar sentencia sumaria a favor de los demandados. Para dictar sentencia en este caso es necesario auscultar y esclarecer todas las circunstancias y pormenores que antecedieron al momento del cierre. Y, como dijimos, la parte promovente ni siquiera presentó una declaración jurada que sostuviera claramente sus proposiciones de hechos.
Por otro lado, es verdad que no podemos pasar por alto que el Art. 1124 del Código Civil, 31 L.P.R.A. see. 3174, establece, en su primer párrafo, que “[e]l pago de las deudas de dinero deberá hacerse en la especie pactada, y no siendo posible entregar la especie, en la moneda de plata u oro que tenga curso legal en Puerto Rico”. Este párrafo, promulgado en el siglo XIX cuando éramos colonia española, debe entenderse adaptado al sistema monetario actual en el que no circulan monedas de plata y oro, sino papel moneda del Tesoro de Estados Unidos. Desde el punto de vista jurídico, la obligación de pagar dinero es la de pagar el importe de la deuda por el valor nominal reconocido al papel moneda.
No obstante, a pesar de las ventajas que representa el pago en dinero efectivo {e.g., la extinción inmediata de la deuda) ofrece algunos inconvenientes como la incomodidad de su volumen, la necesidad de contarlo y el riesgo de pérdida o robo en su transportación. Por eso es usual que en negocios que involucran pagos importantes las partes recurran al uso de documentos mercantiles como letras de cambio, cheques y transferencias electrónicas de fondos. El Código Civil reconoce esta realidad práctica en el segundo párrafo del Art. 1124, supra, al disponer que “[l]a entrega de pagarés a la orden, o letras de cambio u otros documentos mercantiles, sólo producirá los *1109 efectos del pago cuando hubiesen sido realizados, o cuando por culpa del acreedor se hubiesen perjudicado ”.
Este modo alterno de pago, pertenece al ámbito de la autonomía de la voluntad de los contratantes que encuentra reconocimiento en la facultad concedida por el Código para que éstos pacten las cláusulas que no sean contrarias a la ley, la moral o al orden público. Art. 1207, 31 L.P.R.A. see. 3372. Puig Brutau es del parecer de que, “[e]n principio, el deudor no puede obligar al acreedor a que admita un documento mercantil en lugar de la moneda de curso legal... ”. J. Puig Brutau, Compendio de Derecho civil, Ed. Bosch, Barcelona, 1987, Vol. II, a la pág. 99. Esto es así porque “[e]l documento mercantil sólo es una promesa de pago, en lugar del dinero a que se refiere el [Art. 1124 del Código Civil de Puerto Rico]”. Id.
No obstante, es un hecho irrefutable que en la economía moderna —de intenso tráfico jurídico de inmuebles de elevados precios — , los negocios de compraventa se conducen a base de financiamiento hipotecario en los que los cheques y otros instrumentos negociables sustituyen ordinariamente el flujo de efectivo. Lo usual en este tipo de negocio es que los vendedores acepten, como mecanismo de pago, un cheque. Y no debemos olvidar que los contratos “obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y ala ley”. Art. 1210 del Código Civil, 31 L.P.R.A. see. 3375; y Ramírez v. Club Cala de Palmas, 123 D.P.R. 339, 345 (1989).
Esto no implica que un vendedor esté siempre y en toda circunstancia obligado a aceptar un cheque por el sólo hecho de que el librador sea una institución bancaria que brinda el financiamiento. Pero cuando el vendedor conoce de antemano que el precio que habrá de recibir es de una entidad bancaria o hipotecaria que provee el financiamiento para la compraventa, y cuya identidad conoce, no puede oponer como motivo de resolución de la compraventa el que se le pretenda pagar con un cheque, a no ser que hubiere pactado expresamente como condición esencial o principal del contrato que el precio se pague de otro modo. De lo contrario, el modo de pago del precio se considerará una condición accesoria o secundaria que no dará lugar a que el vendedor pueda invocar —con el propósito de obtener la resolución del contrato — , la excepción del contrato no cumplido prevista en el Art. 1077 del Código Civil, 31 L.P.R.A. see. 3052. Del Toro v. Blasini, 96 D.P.R. 676, 683 (1968).
En el caso de autos, por la naturaleza del negocio en cuestión —compraventa y constitución de hipoteca a favor de un banco — , y porque, precisamente, el contrato de opción de compraventa cuya copia aparece unida al apéndice del recurso, no contiene cláusula alguna que demuestre el acuerdo de que el precio se pagaría mediante tres cheques, se debe presumir que el modo de pago del precio era una condición accesoria o secundaria del contrato de compraventa. Quien afirme lo contrario, está obligado a demostrarlo mediante preponderancia de la prueba.
Como último punto a considerar está la cuestión de la alegada conducta del banco SANA Mortgage de negarse a pagar el precio de la compraventa mediante tres cheques en desatención del acuerdo a que habían llegado las vendedoras y el banco. Si las vendedoras tuvieran razón en cuanto a que hubo tal acuerdo entre ellas y el banco, y se demostrara que tal proceder nada tuvo que ver con el comprador, entonces el acto de SANA Mortgage no le es imputable a éste.
Ante los hechos y las circunstancias que quedaron en controversia a raíz de la moción de sentencia sumaria, el tribunal a quo no abusó de su discreción al denegar la moción de sentencia sumaria, pues había hechos cruciales en controversia que deben dilucidarse en un juicio plenario.
Con estos antecedentes, se expide el auto solicitado, y se confirma la resolución recurrida.
Lo acordó el Tribunal y lo certifica la Secretaria Interina del Tribunal de Apelaciones.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
*1110 ESCOLIO 2005 DTA 51
1. En la petición de certiorari, el Ledo. Moscoso asevera (a la pág. 4) que a su moción de desestimación o sentencia sumaria se unieron los codemandados Bermúdez Rojas y Ezratty Samo mediante mociones separadas. No obstante, como no fueron incluidas en el apéndice y ellos, que sepamos, no presentaron recurso alguno contra el dictamen recurrido, estamos imposibilitados de constatar tal aseveración. Es por esta misma razón, que no podemos dictar remedio alguno en este recurso a favor de ellos.