El Juez Asociado Señor Rebollo López
emitió la opinión del Tribunal.
La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (SEAM) construyó, en una parcela de su propiedad, un edificio conocido como Torre del Auxilio Mutuo para el uso exclusivo de oficinas médico-dentales con espacios comerciales y de servicios; ello con el objetivo de ampliar y fortalecer los servicios ambulatorios, los servicios médicos y las facilidades que ofrece el Hospital Auxilio Mutuo.
*720 El edificio Torre del Auxilio Mutuo (Torre) quedó sometido al régimen de propiedad horizontal mediante la Escritura Matriz Número Dos de 1 de mayo de 2000, otorgada por la SEAM ante el notario Luis Oscar Ramos Hernández. En dicha escritura se estableció el uso que habría de tener cada oficina ubicada en la Torre.
A esos efectos, en la cláusula quinta de la escritura matriz se incluyó un listado taxativo que estableció la especialidad dentro de la práctica de la medicina a la cual se dedicaría cada oficina. En lo aquí pertinente, se estableció que la Oficina 518 estaría destinada a la práctica de la Otorrinolaringología, mientras que la Oficina 702 estaría destinada a la práctica de la Cardiología.(1)
A su vez, en la cláusula vigésimo séptima de la Escritura Matriz se estableció, en lo pertinente:
(a) Habiéndose construido este Edificio esencialmente para médicos, dentistas y profesionales de la salud, en cumplimiento con la Ley de Propiedad Horizontal de Puerto Rico, según enmendada, se establecen, clara y específicamente en esta Escritura, los usos a los cuales será destinada cada uni-dad u oficina, según el listado que detalla y se enumera en esta Escritura en la Cláusula QUINTO. En el futuro, luego de realizada la individualización y primera venta de la unidad u oficina, solamente podrá el comprador que adquiera el título de la unidad u oficina o su sucesor, arrendatario o cesionario, usar la unidad u oficina única y exclusivamente para el uso o usos señalados en la Cláusula QUINTO de esta Escritura. Solamente se podrá variar el uso o los usos específicos a los que se destinó la unidad u oficina:
*721 (1) cuando sea para una práctica de la profesión médico [sic] o dental no cubierta en la Cláusula QUINTO de esta Escritura;
(2) cuando el titular de la unidad previamente requiera y obtenga el consentimiento unánime por escrito de los condómin[o]s, según dispuesto en el ordenamiento legal vigente, para variar el uso o los usos señalados en la Cláusula QUINTO para la unidad u oficina.(2)
(e) El titular que en el futuro continúe estudios subespecializados en instituciones académicas reconocidas por las autoridades federales y locales, y que así lo acrediten fehacientemente, al igual que haber recibido las aprobaciones gubernamentales pertinentes para ejercer la mencionada subespecialidad, dicha subespecialidad será incorporada para siempre en los usos de la oficina del titular. Apéndice, págs. 735-738.(3)
Así las cosas, el 18 de abril de 2001 la SEAM le vendió al doctor José Alfonso Serrano Muñoz —cardiólogo de profesión— y a su esposa, María Rosa Freiría Mendía, la Oficina 702, la cual se encuentra destinada, según antes ex- *722 presáramos, a la práctica de la Cardiología.(4) En la correspondiente escritura de individualización y compraventa se incorporó la cláusula vigésimo séptima de la Escritura Matriz.
El 18 de abril de 2002 la SEAM —en calidad de vendedora— el doctor Pedro Redondo Díaz —en calidad de comprador— y el doctor Rafael Lastra Hernández —en calidad de codeudor— suscribieron un contrato de promesa de compraventa, en el cual la SEAM se comprometió a vender la Oficina 518 para el uso exclusivo de la Cardiología. En este contrato incorrectamente se certificó que, en la Escritura Matriz de la Torre, la Oficina 518 se encontraba destinada a la práctica de la Cardiología. No obstante, en la Escritura Matriz la Oficina 518 aparece destinada a la práctica de la Otorrinolaringología.(5)
El 18 de junio de 2002 la SEAM le cursó una carta a los titulares de la Torre notificándoles que los condominos de la Oficina 516 —los cardiólogos Rafael Lastra Hernández, Jorge Lastra Inserni y Pedro Redondo Díaz— deseaban adquirir la Oficina 518 para dedicarla a la especialidad de Cardiología y expandir la práctica que actualmente tienen.(6) En dicha misiva se indicó a los titulares que ello *723 implicaba un cambio de uso, puesto que la Oficina 518 se encontraba destinada a la práctica de la Otorrinolaringología en la Escritura Matriz. Se concedió a los titulares un término de 60 días para oponerse a la compraventa, apercibiéndoseles que de no recibirse objeciones escritas en dicho término la SEAM procedería a culminar el proceso de compraventa.(7)
Conforme a lo expuesto en la misiva enviada por la SEAM, el 20 de junio de 2002 el doctor Serrano le envió al Sr. Joaquín Quiñoy —Presidente de la Comisión de Administración de la SEAM— una carta oponiéndose al cambio de uso propuesto para la Oficina 518.(8) A pesar de dicha oposición, el 30 de septiembre de 2002 la SEAM le vendió al doctor Pedro Redondo Díaz y a su esposa, Cynthia Elizabeth Rivera, la Oficina 518 para la práctica de la Cardiología.(9)
Ante ello, el 6 de junio de 2003 el doctor Serrano y su esposa presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda sobre injunction y daños y perjuicios contra la SEAM, el doctor Rafael Lastra Hernández, el doctor Jorge Lastra Inserni, el doctor Pedro Redondo Díaz y la esposa de este último. Alegaron, en síntesis, que la SEAM varió el uso de la Oficina 518 en clara violación a la Escritura Matriz de la Torre, debido a *724 que no contaba con el consentimiento unánime de los titulares. Solicitaron que el tribunal de instancia dictara un injunction prohibiendo a los demandados usar la Oficina 518 para un fin distinto a la Otorrinolaringología. Solicitaron, además, una indemnización por los daños que le causó la actuación contraria a las disposiciones de la Escritura Matriz.
La SEAM contestó la demanda y adujo, como defensa, que las restricciones de uso desglosadas en la cláusula quinta de la Escritura Matriz sólo aplican luego de realizada la individualización y primera venta de la unidad u oficina. Adujo, además, que el cambio efectuado no varió el número total de oficinas destinadas a la Cardiología en la escritura matriz.
Por otro lado, el doctor Redondo Díaz y su esposa contestaron la demanda y adujeron que compraron la Oficina 518, ya que la SEAM les afirmó que no había objeción alguna para que adquirieran dicha oficina. Adujeron, además, que de haber tenido conocimiento de la objeción no hubiesen llevado a cabo la compraventa.
Por último, los doctores Rafael y Jorge Lastra comparecieron alegando, como defensa afirmativa, que no son dueños ni tienen interés propietario alguno en la Oficina 518.
El Tribunal de Primera Instancia celebró una vista en su fondo. En ésta, el doctor Serrano y su esposa presentaron amplia prueba documental y testifical. Los demandados, luego de presentar una moción al amparo de las disposiciones de la Regla 39.2 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, y de que ésta fuera denegada por el foro de instancia —así como haber sido declarados “sin lugar” los recursos de certiorari que, respecto a dicha determinación, presentaron ante el Tribunal de Apelaciones y este Tribunal— sometieron su caso sin presentar prueba en el tribunal de instancia.(10) Tras varios incidentes procesales, el *725 tribunal de instancia emitió sentencia desestimando la demanda e imponiéndoles al doctor Serrano y a su esposa la suma de $1,000 por temeridad, a favor de los doctores Jorge y Rafael Lastra, por no ofrecer prueba alguna que vinculara a estos últimos con la compraventa u ocupación de la Oficina 518.
Dicho foro determinó que, mediante la cláusula vigésimo séptima de la Escritura Matriz, la SEAM insertó una reserva o escapatoria que le permitía variar el uso asignado a una oficina antes de su primera venta, sin necesidad de obtener el consentimiento unánime de los otros titulares del condominio. Sostuvo el foro primario que dicha reserva o escapatoria no es contraria a las disposiciones de la Ley de la Propiedad Horizontal, que requiere el consentimiento unánime de los titulares para un cambio de uso; ello debido a que dicho consentimiento se obtuvo a través de las escrituras de compraventa de cada unidad u oficina de la Torre, en las cuales se transcribió íntegramente el texto de la cláusula vigésimo séptima de la Escritura Matriz.(11)
Por último, el foro de instancia determinó que, aunque hipotéticamente la SEAM estuviese impedida de variar el uso de la Oficina 518, debido a la oposición del doctor Serrano, el doctor Redondo Díaz y su esposa son adquirentes de buena fe protegidos por la tercería registral. Expuso que el doctor Redondo Díaz y su esposa no tuvieron conocimiento de la oposición del doctor Serrano y que confiaron en las constancias del registro, que claramente indicaban que la SEAM podía realizar el cambio de uso.
*726 Inconformes, el doctor Serrano y su esposa acudieron al Tribunal de Apelaciones.(12) El tribunal apelativo intermedio dictó una sentencia revocatoria expidiendo el injunction solicitado y ordenó la devolución del caso al foro de instancia para que se celebrara una vista dirigida a determinar la existencia y valoración de los daños reclamados por el doctor Serrano y su esposa.
El foro apelativo intermedio señaló que, aunque el consentimiento de los titulares a una variación de uso puede obtenerse a través de las escrituras de compraventa, “ello requiere que la expresión sea clara y precisa de manera que se obtenga un consentimiento informado e inequívoco a tales propósitos”. (Enfasis nuestro.) Apéndice, pág. 1090. Determinó que, en el presente caso, la cláusula vigésimo séptima no cumple con este requisito.
El tribunal apelativo intermedio concluyó, además, que el doctor Redondo Díaz y su esposa no son terceros regístrales, ya que no adquirieron en función de un registro inexacto. Señaló que del registro surgía claramente que la Oficina 518 estaba destinada a la práctica de la Otorrinolaringología y que, ante la inexistencia de un documento que acreditara la variación del uso de la oficina y la inscripción del uso en el Registro, los esposos Redondo no podían alegar desconocimiento de la realidad registral.
Por último, el Tribunal de Apelaciones determinó que no procedía la imposición de temeridad al doctor Serrano y a su esposa por haber incluido como partes demandadas a los doctores Rafael y Jorge Lastra. Señaló que ambos doctores fueron correctamente incluidos como parte demandada debido a que la propia carta circulada por la SEAM indicaba que los doctores Lastra, junto con el doctor Redondo Díaz, estaban interesados en adquirir la Oficina *727 518. El foro apelativo intermedio señaló, además, que el doctor Rafael Lastra Hernández fue parte activa del negocio de compraventa, en vista de que en el contrato de pro-mesa de compraventa aparece su firma como codeudor.
Insatisfechos, la SEAM, los doctores Rafael y Jorge Lastra, y el doctor Pedro Redondo Díaz y su esposa, acudieron ante este Tribunal mediante sendos recursos de certiorari,(13) aduciendo, en síntesis, que el tribunal apelativo intermedio incidió:
1. Al descartar la norma establecida en Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538 (1991), que permite reservas a favor del desarrollador para cambios los de uso de áreas en los condominios, siempre que éstas consten en la escritura matriz y en todas las de compraventa.
2. Al no considerar que la oposición del demandante al cambio de uso de la oficina carecía de fundamento alguno y violentó la buena fe contractual.
3. Al negarle a los codemandados esposos RedondoRivera el carácter de terceros regístrales, protegidos en su adquisición de una oficina para la cardiología.
4. Al dejar sin efecto la imposición de temeridad a favor de los Drs. Rafael y Jorge Lastra.
5. Al sustituir la apreciación de la prueba y las determinaciones de hecho que hizo el Tribunal de Primera Instancia en ausencia de error, pasión, prejuicio o parcialidad.(14)
El 27 de enero de 2006 emitimos una Resolución mediante la cual ordenamos la consolidación y expedición de los recursos presentados. Contando con la comparecencia de las partes y estando en posición de resolver, procedemos a hacerlo así.
*728 I
Conforme al trasfondo fáctico antes expuesto, nos corresponde resolver las controversias siguientes:
A. ¿Se constituyó mediante la cláusula vigésimo séptima de la Escritura Matriz una reserva o escapatoria, a favor de la SEAM, válida en nuestro ordenamiento jurídico? De no ser válida, ¿se requería el consentimiento unánime posterior de los titulares para el cambio de uso de la Oficina 518?
B. ¿La oposición del doctor Serrano violentó los principios de buena fe que rigen en nuestro ordenamiento jurídico?
C. De requerirse el consentimiento unánime y de ser válida la oposición del doctor Serrano, ¿se encuentran los esposos Redondo protegidos por la tercería registrar?
D. ¿Procede la imposición de temeridad contra el doctor Serrano y su esposa por haber incluido como parte demandada a los doctores Rafael y Jorge Lastra?
E. ¿Erró el Tribunal de Apelaciones al no darle deferencia a la apreciación de la prueba y las determinaciones de hecho del Tribunal de Primera Instancia?
II
El Art. 2 de la Ley de la Propiedad Horizontal vigente al momento de los hechos y aplicable a las controversias aquí planteadas,(15) Ley Núm. 104 de 25 de junio de *729 1958, según enmendada por la Ley Núm. 157 de 4 de junio de 1976 (31 L.P.R.A. sec. 1291 et seq.), disponía, en lo pertinente: “La escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el uso a que será destinada toda área comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares.” 31 L.RR.A. sec. 1291.(16)
Conforme a lo antes expuesto, en Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538 (1991), expresamos que el uso de un área puede variarse válidamente si se obtiene el consentimiento de los compradores mediante las escrituras de compraventa o si, posteriormente, los condominos consienten al cambio de forma unánime. En aquella ocasión citamos con aprobación a Arce v. Caribbean Home Const. Corp., 108 D.P.R. 225 (1978), en el cual establecimos que un desarrollador estaba impedido de variar el uso proyectado a un área sin haberles aclarado a los compradores sobre el cambio al firmarse las escrituras de compraventa o sin el consentimiento ulterior unánime de los condominos.
Ello no obstante, dejamos meridianamente claro que la expresión que se haga a esos efectos en las escrituras de compraventa debe ser “una expresión lo suficientemente clara y precisa como para plasmar un consentimiento informado e inequívoco a tales propósitos”. Consejo Tit. C. Parkside v. MGIC Fin. Corp., ante, pág. 554.
*730 Posteriormente, en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., 133 D.P.R. 488 (1993) —decisión que, por las razones que expresaremos a continuación, no aplica a los hechos de este caso— decretamos la nulidad de una reserva de variación de uso a favor de la desarrolladora de un condominio médico-hospitalario, la cual fue incorporada a la escritura matriz del inmueble. En dicho caso, se trataba de una reserva que facultaba a la desarrolladora a “variar [unilateralmente] el uso y destino de los apartamientos y áreas del edificio que retenga y/o adquiera en el futuro”.
Al respecto, resolvimos que la reserva a favor de la desarrolladora —mediante la cual retuvo el derecho unilateral a variar el uso de todo apartamento o área que retuviese o adquiriese en el futuro— es contraria a las claras disposiciones de la ley. Concluimos que “[l]a fuerza vinculante de los pactos y las condiciones impuestas en la escritura matriz o reglamento no pueden contravenir las disposiciones de ley o ser contrarias a la moral o al orden público”. Cond. Prof. S.J. H. Centre v. P.R.F., Inc., ante, pág. 503.
III
Conforme al trasfondo doctrinal antes expuesto, pasamos a resolver la primera controversia hoy ante nuestra consideración, a saber: si mediante la cláusula vigésimo séptima de la Escritura Matriz la SEAM constituyó a su favor una reserva válida en nuestro ordenamiento jurídico.
De entrada, resulta pertinente señalar que lo resuelto en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., ante, no aplica a este caso. Nuestras expresiones en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., ante, estuvieron dirigidas a declarar nula toda reserva que, al igual que la allí analizada, sea incondicional y faculte a un desarrollador a variar el uso designado a un área sin que medien restricciones que delimiten dicha facultad, sobretodo su extensión o duración. Ante la particularidad de la reserva de variación de uso *731 analizada en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., ante, lo allí resuelto no constituye una camisa de fuerza que nos impida reconocer la validez de una reserva de variación de uso que, además de ser clara y precisa, cumpla con otros criterios que restrinjan y delimiten la facultad reconocida en la reserva, como lo es la imposición de condiciones.
Extender la norma pautada en Cond. Prof. S.J. H. Centre v. P.R.F., Inc., ante, a este caso significaría que toda reserva a favor de un desarrollador respecto a una variación de uso es nula en nuestro ordenamiento. Nada más lejos de la verdad. Ciertamente, fútil sería que reconozcamos la posibilidad de obtener el consentimiento de los compradores a un cambio de uso mediante las escrituras de compraventa si todas las reservas de variación de uso a favor de un desarrollador no tienen cabida en nuestro ordenamiento jurídico.
La validez de una u otra reserva de variación de uso dependerá de un análisis caso a caso que, sin ánimos de ser taxativos, tome en consideración los siguientes factores siguientes: (1) la inclusión de la reserva en la escritura matriz del condominio y en las escrituras de compraventa de cada unidad, oficina o apartamento; (2) la redacción clara y precisa de la reserva, que no dé margen a especulaciones o interpretaciones distintas; (3) el apercibimiento a los compradores de que mediante la firma de la escritura de compraventa consienten a la reserva; (4) la existencia de condiciones que delimiten la facultad concedida en la reserva, sobretodo, que la facultad del desarrollador a variar el uso no sea perpetua; (5) el uso al cual originalmente se encuentra destinada el área, unidad u oficina en cuestión, y (6) que la reserva sea razonable y responda a fines legítimos.
Aclarada la posibilidad de constituirse una reserva válida de variación de uso a favor de un desarrollador, pasamos a resolver si en el presente caso efectivamente se constituyó una reserva válida que cumpla con los criterios antes expuestos. Respondemos en la negativa. Luego de un *732 detenido examen de la cláusula vigésimo séptima en cuestión, creemos que ésta no cumple con los requisitos de claridad y precisión requeridos. Así lo confirma el ambiguo lenguaje utilizado en dicha cláusula. Veamos.
La SEAM sostiene que mediante la cláusula vigésimo séptima de la Escritura Matriz —específicamente al utilizar los términos “en el futuro” y “luego de realizada la individualización de la unidad u oficina”— dejó establecido que las restricciones de uso no le aplican y que, por lo tanto, estaba facultada para variar los usos especificados, siempre que fuese antes de la individualización y primera venta de cada unidad u oficina. Aducen que la reserva es válida porque se limita a cambios de uso anteriores a la primera venta de las unidades u oficinas y porque responde a un fin legítimo, a saber, evitar que la SEAM no pueda vender las oficinas para cuya especialidad no exista demanda. No le asiste la razón.
Si la intención de la SEAM fue reservarse la facultad limitada de variar el uso de una unidad u oficina antes de su individualización o primera venta, así debió establecerlo expresamente en la Escritura Matriz y en cada una de las escrituras de compraventa. Es decir, debió insertar expresamente que, previo a la individualización y primera venta de las unidades u oficinas, se reservaba la facultad de variar el uso destinado a éstas y apercibir a los compradores que mediante la firma de las escrituras de compraventa consentían a que el desarrollador llevase a cabo los cambios de uso, bajo los términos y las condiciones de la reserva. No lo hizo. En vista de ello, concluimos que la cláusula vigésimo séptima en cuestión no constituye una expresión lo suficientemente clara y precisa como para plasmar el consentimiento informado e inequívoco de los compradores de la Torre a la reserva reclamada por la SEAM.
La ambigüedad del lenguaje utilizado en la referida cláusula queda confirmada por el testimonio de los diferentes testigos que declararon durante el juicio. En la vista en *733 su fondo, testificó el ingeniero Manuel E. Ares Ubarri. Éste fue miembro de la Junta de Directores del Auxilio Mutuo, fungió como Presidente del Comité de Finanzas y colaboró en la orientación sobre la viabilidad de la construcción de la Torre y en la fase de publicación y proyección del proyecto. En lo pertinente, el ingeniero Ares declaró lo siguiente:
P. Si iba a ocurrir una primera venta, o sea, por la Sociedad Española, de una oficina que tenía un uso asignado y la Sociedad Española interesaba cambiar el uso para vendérsela a un médico que le interesaba para otra especialidad, ¿cuál era el mecanismo?
R. Pues había que notificárselo a los condominos treinta, sesenta o noventa días con antelación y si había oposición, pues había que ponderar la oposición esa para entonces cambiar el uso y sometérselo al Registro. Si no había problema de ... con los condominos, pues se podía someter al Registrador y el cam-bio, si había problemas, pues era urna decisión del Auxilio venderla, cambiarle el uso o hacer otro tipo de negocio. Apéndice, págs. 379-380.
En cuanto a la carta que enviaba la SEAM para informarles a los titulares sobre las propuestas de cambio de uso, el ingeniero Ares indicó que éstas no eran de cortesía, sino que eran una obligación.(17) Indicó el ingeniero Ares, además, que
... [d]esde las últimas reuniones que yo tuve con la Junta y se me presentaron esos documentos para la aprobación ... se le explicó claramente a la Junta que al asumir ese “mix” [de especialidades médico-dentales] ya final, era “the point of no return” en el sentido que estábamos encajonados a una condición de venta, que habí [a] unas escapatorias, pero era cuestión de hacerla[s] correctamente .... (Énfasis nuestro.) Apéndice, pág. 404.
*734 Por otro lado, también testificó el Dr. Manuel N. Miranda Ferrer, oftalmólogo de profesión. Este fue el primer médico en adquirir una opción de una oficina en la Torre y quien ha fungido como Presidente de la Junta de Condominos de la Torre desde que se constituyó la Junta de Directores de ésta. En lo pertinente, el doctor Miranda Ferrer declaró lo siguiente:
P. Cuando ha habido una necesidad o deseo de cambiar el destino de una unidad, ¿cuál es el procedimiento que se ha seguido?
R. El procedimiento que siempre se ha seguido fue que el hospital le escribía una carta a cada condomino diciéndole o especificándole que tal oficina con tal especialidad deseaba ser cambiada a tal otra especialidad y que si no había ninguna oposición en sesenta días, pues se daba por sentado el cambio.
P. Okay. ¿Y si había oposición?
R. Si había oposición no se vendía a esa especialidad.
P. No, no se vendía. Dígale al Tribunal si en alguna ocasión, que usted conozca, se vendió la unidad a pesar de haber oposición de alguno de los médicos o de alguno de los condominos.
R. La única ocasión que sé es la que estamos actualmente. (Énfasis nuestro.) Apéndice, págs. 423-424.
Las declaraciones antes esbozadas, unidas a la propia declaración del doctor Serrano a los efectos de que para él los términos y las condiciones de la Escritura Matriz representaban “la seguridad de que estas oficinas tenían un uso específico y que únicamente podría cambiarse con el consentimiento de todos los condominos” (Apéndice, pág. 117), son razón suficiente para concluir que no hubo —por parte de los compradores de la Torre— el consentimiento informado e inequívoco requerido para que se entienda que éstos, mediante las escrituras de compraventa, autorizaron a la SEAM a cambiar el uso de las oficinas antes de la primera venta.
Además, los propios actos de la SEAM confirman lo aquí resuelto. Según surge del expediente y del testimonio del doctor Miranda Ferrer, la SEAM, luego de otorgarse la Escritura Matriz de la Torre, siempre se adhirió a un mismo proceso antes de llevar a cabo una compraventa que implicara un cambio de uso. La SEAM les enviaba a los titulares *735 una carta notificándoles el cambio propuesto. En dicha carta les concedía a los titulares el término de 60 días para oponerse a la compraventa, apercibiéndoles que de no recibirse objeciones escritas en dicho término, la SEAM procedería a culminar el proceso de compraventa. De mediar objeción de alguno de los titulares, no se llevaba a cabo la compraventa.(18)
La SEAM aduce que optó por adherirse al proceso de notificación por deferencia a los condominos y para procurar un ambiente de intercambio de ideas que promoviera la armonía entre todos los condominos. No nos persuade. Sabido es que por disposición expresa del Art. 1234 del Código Civil, 31 L.P.R.A. see. 3472, al momento de juzgar la intención de las partes contratantes “deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato”. La fiel adhesión de la SEAM a dicho proceso no es más que un acto posterior de reconocimiento de que, mediante la Escritura Matriz, se estableció como requisito para un cambio de uso el consentimiento unánime posterior de los titulares de la Torre.
Por consiguiente, concluimos que para variar el uso de la Oficina 518 se requería el consentimiento unánime posterior de los titulares del condominio.(19)
IV
Ahora bien, los peticionarios sostienen que, aun cuando se requiriese el consentimiento unánime posterior de los *736 titulares, la objeción del doctor Serrano no es válida por ser contraria al principio general de la buena fe que rige en nuestro ordenamiento jurídico.(20) Sostienen que el doctor Serrano no pudo ofrecer ninguna razón válida en derecho para su oposición a la variación de uso de la Oficina 518. No les asiste la razón.
No podemos imputarle mala fe al doctor Serrano cuando éste fue la única parte que actuó conforme a lo plasmado en la Escritura Matriz de la Torre. Ante la falta de una reserva de variación de uso válida, clara y precisa a favor de la SEAM, el doctor Serrano no estaba obligado a aceptar el cambio de uso propuesto y, como titular, tenía el derecho a oponerse.
Tampoco podemos concluir que el doctor Serrano, al oponerse al cambio de uso propuesto, actuó movido por el mero capricho o la mala fe. No debemos olvidar que la propia SEAM, al proponerles a los titulares el cambio de uso de la Oficina 518, expuso que la intención de los compradores era expandir la práctica de la Cardiología que ejercían en la Oficina 516.
Al respecto, el doctor Serrano declaró en juicio lo siguiente:
R Se me hicieron unas representaciones de que estas ... digo, estas oficinas, licenciado, eran oficinas individuales, el *737 cambiarle el uso a la oficina 518 a Cardiología, la convierte en una doble unidad de Cardiología. Obviamente puede acomodar un grupo de Cardiología y mayor número de cardiólogos, esto es claro y yo no puedo acomodar ... yo no puedo acomodar tres cardiólogos en mi oficina. O sea, que es lógico que una vez usted aumente el espacio de trabajo y establece unas facilidades, usted puede tener mayor número de cardiólogos en esas facilidades. Apéndice, pág. 221.
De igual forma, la esposa del doctor Serrano declaró en juicio que
[n]o es lo mismo tener una oficina con un solo médico que tener un espacio doble donde pueden tener las facilidades para tener un laboratorio de Cardiología completo. La competencia no es la misma si es un médico con un médico, que si es un mega grupo contra un médico. En esa oficina en un momento dado estaban practicando cuatro cardiólogos, ahora al retirarse uno de los doctores Lastra han vuelto a practicar tres cardiólogos. Pero ellos allí tienen todas las facilidades de Cardiología en un laboratorio completo. Apéndice, pág. 361.
Ciertamente, el deseo de proteger su práctica y, sobre todo, de evitar la posible competencia desleal que produciría la creación de una mega práctica de la especialidad de Cardiología en la Torre, no son motivos matizados por la mala fe. Al establecerse en la Escritura Matriz una distribución específica de especialidades por piso era perfectamente legítimo, de parte del doctor Serrano, esperar que las restricciones de uso le protegerían de la creación de una mega práctica sin su consentimiento; más cuando el doctor Serrano siempre entendió que su consentimiento era necesario para que se aprobara un cambio de uso.
En todo caso, la mala fe le es imputable a la SEAM, quien, con conocimiento de las restricciones de uso, procedió a suscribir un contrato de promesa de compraventa en el cual se certificaba falsamente que la Oficina 518 estaba destinada en la Escritura Matriz a la práctica de la Cardiología y quien, con conocimiento de la oposición del doctor Serrano, procedió a vender la Oficina 518 para la práctica de la Cardiología, sin informarles a los compradores *738 que medió una oposición de los titulares.(21) Resolver lo contrario sería premiar a quien ha actuado de forma contraria al principio general de la buena fe y castigar al que reclama los derechos adquiridos como consecuencia de lo ex-presamente pactado por las partes.
V
Como tercer señalamiento de error, los peticionarios aducen que aunque fuese necesario el consentimiento unánime posterior de los titulares y aunque la objeción del doctor Serrano fuese válida, los esposos Redondo-Rivera se encuentran protegidos por la tercería registral. Sostienen que al adquirir la Oficina 518 los esposos Redondo-Rivera confiaron en que de la Escritura Matriz y, por ende, del Registro surgía la facultad de la SEAM para variar el uso de la Oficina 518. Tampoco les asiste la razón.
El Art. 105 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2355, establece, en lo pertinente:
A pesar que la inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes, ni altera las relaciones jurídicas de quienes intervengan como partes en dichos actos o contratos, el tercero que de buena fe y a título oneroso adquiera válidamente algún derecho de persona que en el Registro aparezca con facultad para transmitirlo será mantenido en su adquisición, una vez haya inscrito su derecho, cuando por cualquier razón resulte inexacto el Registro, bien sea que se rescinda, resuelva o anule el título del otorgante en virtud de causas que no resulten clara y expresamente del propio Registro, o que existan sobre la finca acciones o títulos de dominio o de otros derechos reales que no estén debidamente inscritos. (Enfasis suplido.)
*739 La normativa aplicable es clara. Para que aplique la protección de la tercería registral es indispensable que la información que surja del Registro sea inexacta. En el presente caso no estamos ante un registro inexacto. Del Registro surgía con exactitud que la Oficina 518 se encontraba destinada a la práctica de la Otorrinolaringología y que, conforme a lo antes resuelto, la SEAM no estaba facultada a variar el cambio de uso sin el consentimiento unánime posterior de los titulares. Ello impide que los esposos Redondo-Rivera reclamen la protección de la tercería registral.(22)
VI
En su cuarto señalamiento de error, los peticionarios aducen que el Tribunal de Apelaciones incidió al dejar sin efecto la imposición de sanciones por temeridad contra el doctor Serrano y su esposa. Aun cuando la imposición de sanciones por temeridad procede únicamente contra una parte perdidosa y que, en virtud de lo antes resuelto, el doctor Serrano y su esposa no pueden ser considerados como parte perdidosa, procedemos a atender brevemente el error señalado y resolvemos que el tribunal apelativo intermedio no erró al respecto. Veamos.
En el presente caso, el matrimonio Serrano incluyó a los Drs. Rafael y Jorge Lastra como partes demandadas, principalmente, porque de concederse el remedio solicitado, éstos tendrían que desalojar la Oficina 518. No obstante, el Tribunal de Primera Instancia entendió que el doctor Serrano y su esposa fueron temerarios al incluir a los doctores Lastra en el pleito, debido a que no presentaron prueba que vinculara a estos doctores con la compraventa u ocupación de la Oficina 518.
Aunque es cierto que los doctores Lastra no comparecieron como compradores en la escritura de compraventa de *740 la Oficina 518, no podemos avalar la determinación del Tribunal de Primera Instancia al respecto. Ello debido a que el doctor Serrano tuvo razones suficientes para incluir y mantener a los doctores Lastra como partes demandadas en el pleito.
En primer término, la inclusión de los doctores Lastra en la demanda se debió a que la propia SEAM les indicó a los titulares mediante carta que los doctores Lastra estaban interesados en adquirir la Oficina 518 para expandir la práctica que hasta el momento ejercían en la Oficina 516.
En segundo término, los propios peticionarios —entiéndase, los doctores Lastra y el doctor Redondo Díaz— aceptaron, mediante sus respectivas contestaciones a la demanda, que la Oficina 518 es un anejo de la Oficina 516, que practicaban la Cardiología en la Oficina 518 y que cuando el doctor Redondo compró la Oficina 518 lo hizo para expandir la Oficina 516.(23)
Indudablemente, todo lo antes expuesto constituyó justificación suficiente para que el doctor Serrano haya incluido y mantenido a los doctores Lastra como partes demandadas en el pleito, pues de concederse el remedio . solicitado, la práctica que hasta el momento éstos ejercían resulta afectada de alguna forma u otra.
VII
Por último, los peticionarios aducen que el Tribunal de Apelaciones erró al no darle deferencia a la apreciación de la prueba y a las determinaciones de hecho del Tribunal de Primera Instancia. Tampoco les asiste la razón en dicho señalamiento.
*741 Como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos; tampoco tiene facultad de sustituir por sus propias apreciaciones las determinaciones del foro de instancia. Rolón v. Charlie Car Rental, Inc., 148 D.P.R. 420 (1999).
La normativa antes expuesta no es absoluta. Esta cede si puede establecerse que en las determinaciones del Tribunal de Primera Instancia medió pasión, prejuicio, parcialidad o error manifiesto. Álvarez v. Rivera, 165 D.P.R. 1 (2005).
En este caso, el Tribunal de Primera Instancia determinó, en base a la prueba presentada, que la SEAM estableció una reserva válida a su favor y que dicha reserva surgía de forma clara y precisa de la Escritura Matriz de la Torre.
Ello, de por sí, constituye justificación suficiente para que tanto el Tribunal de Apelaciones como este Tribunal intervengamos con la apreciación de la prueba y las determinaciones de hecho del Tribunal de Primera Instancia. De lo contrario, avalaríamos un error manifiesto por parte del foro de instancia, en clara contradicción a la norma de claridad y precisión establecida por este Tribunal desde 1991 en Consejo Tit. C. Parkside v. MGIC Fin. Corp., ante.
VIII
En mérito de lo antes expuesto, procede confirmar la sentencia emitida por el Tribunal de Apelaciones, mediante la cual se expidió un injunction prohibiendo a los demandados utilizar la Oficina 518 para algún uso diferente a la práctica de la Otorrinolaringología, y devolver el caso al foro de instancia para que se celebre una vista para determinar la existencia y valoración de los daños reclamados por el doctor Serrano y su esposa.

Se dictará sentencia de conformidad.

*742 El Juez Presidente Señor Hernández Denton concurrió con la “opinión del Tribunal por entender que en este caso la cláusula vigésimo séptima no contiene una reserva que le permitiera a la Sociedad Española de Auxilio Mutuo variar el uso asignado sin antes obtener el consentimiento unánime de todos los titulares. Por ende, como el Dr. José Alfonso Serrano Muñoz expresó su oposición a la variación de uso de una de las oficinas del condominio, y al no haber sido enmendada la cláusula quinta de la Escritura Matriz, dicho local tenía que ser destinado para el ejercicio de la especialidad de Otorrinolaringología”. La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente. El Juez Asociado Señor Fuster Berlingeri no intervino.
(.Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

 Según surge del expediente y de la sentencia emitida por el Tribunal de Primera Instancia, durante la etapa de planificación inicial de la Torre del Auxilio Mutuo (Torre) se sometieron varias propuestas respecto a la asignación de especialidades médico-dentales a las oficinas ubicadas en ella. La distribución o mezcla inicial sólo vislumbraba cinco oficinas para la práctica de la Cardiología. La distribución o mezcla inicial fue variando a medida que se fue desarrollando el proyecto, conforme a la variación en la demanda y a la especialidad de los facultativos médicos del Hospital Auxilio Mutuo interesados en adquirir una oficina en la Torre. La Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (SEAM) y los médicos interesados suscribían un contrato de opción de compraventa en el que se indicaba la especialidad a la cual se dedicaría la oficina sujeta a opción. Luego de sujetas a opción la mayor parte de las oficinas, se otorgó e inscribió en el Registro de la Propiedad la Escritura Matriz de la Torre, con el listado taxativo antes mencionado. En dicho listado taxativo aparece un número total de quince oficinas destinadas a la práctica de la Cardiología.

 El 24 de abril de 2000 la SEAM aprobó el Reglamento para la Administración del Condominio Torre del Auxilio Mutuo. La Escritura Matriz de la Torre, especialmente sus cláusulas quinta y vigésimo séptima, se incluyeron del Reglamento.

 En el inciso (b) de la cláusula vigésimo séptima se establece lo siguiente: “[c]uando se fuere a traspasar la titularidad por cualquier forma, se debe seguir el estricto orden: 1. El titular o sus herederos tasarán la propiedad a través de un profesional acreditado para ello. 2. Notificarán por correo certificado con acuse de recibo a la Administración del Condominio con el precio de venta según tasación que se acompaña. 3. La Asamblea notificará inmediatamente al Consejo de Titulares y a todas las partes interesadas de la oferta de venta y quienes a su vez tendrán sesenta (60) días a partir de la fecha de la notificación de la Administración para contestar por escrito a éstos su aceptación de comprar la oficina por el precio tasado. 4. Tendrán preferencia en la compra de la oficina en el siguiente orden: a) Los titulares de la misma práctica profesional para dedicarla al mismo uso del que la adquiere, b) En su ausencia los demás titulares para dedicarla al uso al cual ellos dedican la suya en el Condominio, c) En su ausencia la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico Inc., quien es también titular para dedicarla al uso para el cual el vendedor la utilizaba, d) En su ausencia cualquier profesional [de la Facultad Médica del Hospital Auxilio Mutuo para dedicarla al uso para el cual está acreditado el comprador a ejercer su profesión.] e) En el caso de que dos propuestas o más sean recibidas por el vendedor, éste último seleccionará la que esté en preferencia según el orden antes señalado. En caso de estar las ofertas recibidas en la misma preferencia, el vendedor seleccionará la misma a su entera discreción, f) En su ausencia después de transcurrir los sesenta (60) días del aviso de la Administración, sin recibirse contestación de los interesados, podrá vender el titular o sus herederos, por el precio que estimen razonable, a cualquier profesional de la salud acreditado en el país para ejercer su práctica profesional en el campo médico-dental.” Apéndice, págs. 736-737.

 Dicha compraventa se efectuó mediante la Escritura Número 158 sobre Individualización de Unidad de Condominio y Compraventa, otorgada ante el notario Francisco M. Vázquez Santoni. Previo a ello, el 15 de mayo de 1996 la SEAM y el doctor Serrano suscribieron un contrato de opción de compra en el cual se estableció lo siguiente: “[l]as partes acuerdan que, en armonía con el Artículo 2 ... de la Ley de Propiedad Horizontal de Puerto Rico, el uso exclusivo al cual se dedicará la oficina número 702 ... objeto de este contrato, será Cardiolog[í]a. Este uso al que se destina la oficina se incorporará a la Escritura Matriz del inmueble y el mismo sólo podrá ser variado mediante el consentimiento de los titulares de acuerdo con lo requerido por la Ley de Propiedad Horizontal de Puerto Rico, según enmendada.” Apéndice, pág. 540.

 Específicamente, la cláusula segunda de dicho contrato establece: “LA VENDEDORA se compromete a vender y LA COMPRADORA se compromete a comprar la Oficina Número 518, para el uso exclusivo de la Oficina de Cardiología. LA COM-PRADORA reconoce y acepta que este uso al que se destina la oficina aparece incorporado a la ESCRITURA MATRIZ del inmueble y que el mismo sólo podrá ser variado mediante el consentimiento de los titulares, y de conformidad con lo requerido por la Ley de Propiedad Horizontal de Puerto Rico, vigente. La propiedad está construida y la distribución interior será la existente”. Apéndice, pág. 779.

 Según surge del expediente, el Dr. Rafael Lastra Hernández, el Dr. Jorge Lastra Inserni y el Dr. Pedro Redondo Díaz ejercían su práctica de la Cardiología en *723 la oficina 516, la cual es contigua a la oficina 518 en cuestión. La oficina 516, a diferencia de la oficina 518, sí se encuentra destinada a la práctica de la Cardiología en la Escritura Matriz de la Torre. A pesar de que el doctor Redondo Díaz ejercía su práctica en la Oficina 516, éste no es dueño o titular de dicha oficina.

 Dicha carta fue cursada por la SEAM a través del Sr. Joaquín Quiñoy, presidente de la Comisión de Administración de la SEAM.

 La carta enviada por el doctor Serrano lee como sigue: “Sirva la presente para notificarle mi oposición al cambio de uso propuesto por usted, en su comunicación del 18 de Junio del 2002, para la oficina 518 del Condominio Torre de Auxilio Muto.” Apéndice, pág. 785.

 Según surge del expediente, la compraventa de la Oficina 518 se efectuó mediante la Escritura Número 530, sobre Individualización de Unidad en Condominio y Compraventa, ante la notario Adela Surillo Gutiérrez. Dicho negocio jurídico constituyó la individualización y primera venta de la Oficina 518. A pesar de que la SEAM —mediante la carta enviada a los titulares de la Torre— indicó que los Drs. Rafael Lastra Hernández y Jorge Lastra Inserni figuraban, junto con el Dr. Pedro Redondo Díaz, como compradores de la Oficina 518, en la escritura de compraventa sólo compareció el Dr. Pedro Redondo Díaz y su esposa como parte compradora.

 Luego de concluir el desfile de prueba del doctor Serrano y su esposa —parte demandante recurrida-—• los demandados, repetimos, solicitaron la desestimación de la demanda de acuerdo con la Regla 39.2(c) de Procedimiento Civil, 32 L.P.R.A. Ap. *725 III. El Tribunal de Primera Instancia denegó dicha solicitud, por lo cual las partes afectadas recurrieron al Tribunal de Apelaciones y a este Tribunal en revisión de dicha denegatoria. Tanto el Tribunal de Apelaciones como este Tribunal denegaron la revisión solicitada y el caso fue devuelto al Tribunal de Primera Instancia paira la continuación de los procedimientos.

 Citó en apoyo a su determinación a Consejo Tit. C. Parkside v. MGIC Fin. Corp., 128 D.P.R. 538 (1991), en el cual este Tribunal resolvió que el consentimiento unánime de los titulares puede obtenerse mediante las escrituras de compraventa.

 Previo a acudir al Tribunal de Apelaciones, el doctor Serrano y su esposa presentaron ante el Tribunal de Primera Instancia una moción de determinaciones de hecho y conclusiones de derecho adicionales, de acuerdo con la Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Dicha moción fue declarada “no ha lugar” mediante una orden emitida por el foro de instancia el 20 de diciembre de 2004.

8) La SEAM compareció ante este Tribunal mediante el recurso CC-2005-888, los Drs. Bafael Lastra Hernández y Jorge Lastra Inserni mediante el recurso CC-2005-903 y el doctor Eedondo Díaz y su esposa mediante el recurso CC-2005-904.

 Previo a acudir a este Tribunal, todos los demandados solicitaron la reconsideración ante el Tribunal de Apelaciones. El tribunal apelativo intermedio denegó dicha solicitud y se reafirmó en la sentencia previamente emitida.

 Aun cuando la nueva Ley de Condominios, aprobada el 5 de abril de 2003, tiene efectos retroactivos, dicho efecto no se extiende al caso hoy ante nuestra consideración. En Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101 (2006), dispusimos que el efecto retroactivo de la Ley de Condominios no podrá afectar derechos adquiridos por las partes en virtud de la legislación anterior. “El derecho adquirido ... es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que regía al amparo de la ley anterior”. íd., pág. 109.
En el presente caso, los asuntos medulares en controversia, entiéndase, la Escritura Matriz de la Torre, el cambio de uso de la Oficina 518 y la oposición del doctor Serrano, se consumaron durante la vigencia de la Ley de la Propiedad Horizontal y, ciertamente, el doctor Serrano, parte afectada, descansó en dicho estado de derecho anterior al momento de oponerse al cambio de uso propuesto.

 La nueva Ley de Condominios no varió significativamente el artículo aquí citado. El Art. 3 de la nueva ley, en lo que aquí respecta, dispone: “La escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble, y, excepto que [esta ley] autorice lo contrario, una vez fijado dicho destino y uso sólo podrá ser variado mediante el consentimiento unánime de los titulares.”
No obstante, la nueva ley, en su Art. 25 (31 L.P.R.A. sec. 1293b(d)(3), permite que en los condominios exclusivamente comerciales o profesionales, las dos terceras partes de los titulares, que a su vez reúnan las dos terceras partes de las participaciones en los elementos comunes del inmueble, varíen el uso fijado a un área o a un local comercial o profesional, si así lo autoriza la escritura matriz. Esta disposición no aplica al presente caso.

 De la transcripción surge lo siguiente:
“P. Cuando se fuera a intentar hacer un cambio por la Sociedad Española de Auxilio Mutuo y se cursaba por el señor Quiñoy esas cartas a los condominos, según el criterio suyo, ¿son una mera cortesía o era un requisito legal? ...
“R. Yo no entiendo que sea de cortesía, esto es puro ... esto es puro negocio. O sea, yo tengo una obligación como síndico, como director de una institución tan grande que va más allá de la cortesía para mí.” Apéndice, págs. 381-389.

 De la prueba documental que obra en el expediente surge que para los cambios de uso propuestos para la Oficina 803 y 813 medió objeción de los titulares y que la SEAM no culminó el proceso de compraventa de dichas oficinas.

 Resulta pertinente señalar que no será necesario el consentimiento unánime posterior de los titulares de la Torre ante otras circunstancias establecidas en la cláusula vigésimo séptima de la Escritura Matriz, que clara y expresamente están eximidas de dicho consentimiento, como por ejemplo, cuando el cambio de uso es para una práctica de la profesión médica o dental no cubierta en la cláusula quinta de la Escritura Matriz o si el titular, en el futuro, continúa estudios subespecializados. Pues, por disposición expresa de la Escritura Matriz, dicha subespecialidad será incorporada para siempre en los usos de la oficina del titular.

 La nueva Ley de Condominios estableció, expresamente, en su Art. 1-A, lo siguiente: “En el ejercicio y reclamo de sus derechos, los titulares actuarán conforme a los principios de la buena fe, de la prohibición de ir en contra de sus propios actos y la del abuso del derecho.” A su vez, el Art. 38-C(d) de la nueva Ley de Condominios dispone que “[l]a oposición a un acuerdo que requiera unanimidad, deberá fundamentarse expresamente, bien en la asamblea o por escrito, según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. La oposición infundada se tendrá por no puesta”. 31 L.P.R.A. sec. 1293b-3(d). El requisito de fundamentar expresamente la oposición no aplica al presente caso debido a que el efecto retroactivo de la nueva Ley de Condominios no se extiende a situaciones en que, como en la presente, esté involucrado algún derecho adquirido de las partes. Véase Consejo Titulares v. Williams Hospitality, ante. Aquí, el doctor Serrano actuó bajo el estado de derecho anterior, en el cual no se requería fundamentar expresamente una oposición. Sin embargo, independientemente de que en la Ley de Condominios de 2003 se haya insertado expresamente que los titulares deben actuar conforme a los principios de la buena fe, dichos principios siempre han regido en todo nuestro ordenamiento jurídico y, por ende, aplican a la presente situación de hechos.

 El doctor Redondo Díaz y su esposa alegaron en su contestación a la demanda que la SEAM les afirmó que no medió oposición alguna de los titulares. Por su parte, el doctor Serrano declaró en juicio que le constaba que los esposos Redondo no tenían conocimiento de su oposición. El Tribunal de Primera Instancia adoptó lo declarado por el doctor Serrano como una determinación de hecho y hasta la propia SEAM utiliza el desconocimiento de los esposos Redondo-Rivera para establecer la buena fe de estos últimos al momento de adquirir la Oficina 518.

 Lo antes resuelto no significa que los esposos Redondo-Rivera estén impedidos de reclamarle a la SEAM cualquier remedio que en derecho proceda.

 Específicamente, los doctores Lastra adujeron en su contestación a la demanda que la ocupación de la Oficina 518, por ser un anejo de la Oficina 516, no establece una oficina adicional de Cardiología. Por su parte, el doctor Redondo, en su contestación a la demanda, aceptó que tanto él como los doctores Lastra practicaban la Cardiología en la Oficina 518, y que cuando compró la Oficina 518 lo hizo para expandir la Oficina 516.